UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2017 OCT 27  PM 3: 10

CLERK

BY_____
DEPUTY CLERK

BRIAN CROTEAU, SR., LARRY PRIEST,      )
and RICHARD PURSELL, on behalf of      )
themselves and all others similarly situated,   )
                                       )
        Plaintiffs,                    )
                                       )
        v.                             )          Case No. 5:17-cv-207
                                       )
CITY OF BURLINGTON,                    )
                                       )
        Defendant.                     )

**ORDER ON REQUEST FOR PRELIMINARY INJUNCTION**

Three homeless men have filed this lawsuit under 42 U.S.C. § 1983 seeking to prevent

their removal from their encampment on undeveloped property owned by the City of Burlington

(the "City"). (Doc. 1.) The court has subject matter jurisdiction because Plaintiffs seek relief

arising out of the Eighth and Fourth Amendments made applicable to the City through the

Fourteenth Amendment.

The case has developed quickly because the plaintiffs' removal was scheduled for

October 23, 2017. The plaintiffs filed suit on October 20, 2017, and the court issued a temporary

restraining order (TRO) delaying any action by City officials until the hearing on the motion for

a preliminary injunction was held occurred on October 25, 2017. The court heard testimony

from witnesses for both sides. The court extended the temporary restraining order until it could

issue a decision on the motion for a preliminary injunction.

**Facts**

In 2016, the City of Burlington acquired approximately 12 acres of undeveloped

woodland in the vicinity of 311 North Avenue. The property includes sandy bluffs with a

prospect west over Lake Champlain. A trail running through the property is used by walkers,

runners and mountain bikers.  Although not designated as a City park, the property is intended to be preserved for wildlife and human recreation as an urban wild area.[1]  The bluffs are the remains of ancient glacial riverbeds.  They are resilient to compaction, but if they are damaged by human activity such as digging, they become vulnerable to erosion.

During the City's ownership of the property, several groups have set up encampments near the bluffs.  The current encampment includes four tents and approximately eight campers.  It has been in place since the spring of 2017.   The residents include the three named plaintiffs.

The homeless encampment became an issue for municipal authorities when the City's land steward Dan Cahill, who is responsible for caring for open undeveloped City property, became concerned about potential damage to the sandy bluffs during the summer of 2017.  Residents of a previous encampment had dug holes near the bluffs which caused damage.  Mr. Cahill was concerned that the current encampment would cause additional harm.  He requested removal of the encampment.

In August, representatives of the Burlington Police Department (BPD) and other municipal offices including Community and Economic Development Office (CEDO), and the Parks and Recreation Department agreed that removal of the encampment was appropriate.  Following City policy, they considered four criteria for removal of homeless encampments.  These are: health and safety; the intended use of the property; repeated violations of law; and location.  (*See* Pls.' Ex. 6.)  In this case, the environmental concerns raised by Mr. Cahill persuaded the department leaders to take steps to remove the encampment.

---

[1] Plaintiffs introduced a screenshot from the Burlington Parks and Recreation website that lists several City areas as "urban wilds." (Pls.' Ex. 4.)  The undeveloped woodland at issue in this case is not listed among those areas on the website.  Of course, the website may not reflect the area's official status, especially since the property was acquired relatively recently.  In any case, credible hearing testimony established that the City has deemed the area to be ecologically sensitive due to the sandy bluffs and the presence of wildlife.

2

In September the City made efforts to reach out to the campers to determine their needs and intentions. In early October, the City posted a Notice to Vacate stating that the presence of people living or visiting the property was unwelcome and that campers "must take Your things and leave and not return or face prosecution under 13 V.S.A. § 3705 for trespass and removal of the things you leave on the property." (Pls.' Ex. 1.) The notice stated that camping was not permitted and all camps, structures and possessions must be removed by October 23, 2017.

The plaintiffs remain on the property. Two of the three testified at the preliminary injunction hearing.

Mr. Croteau testified that he has been homeless since August 2016 when he moved into his car. He lost the car when it was towed in February 2017 for lack of registration. He lived in a bus stop for two weeks before moving onto the 311 North Avenue property in March 2017. He has lived there ever since. Mr. Croteau has no financial resources and no family or friends in the area who are able to take him in. He made some efforts to connect with emergency or shelter housing. These efforts have been rather cursory and he has not taken part in a formal intake interview or made a determined effort to locate alternative housing since joining the encampment. He has erected two tents at his campsite. He has furnished these with bureaus for his clothing and cots for sleeping. Mr. Croteau knows of other encampments on City property where he could erect his tents if he is forced to move from the 311 North Avenue property.

Larry Priest testified that he lives in a large ten-man tent with a roommate. He suffers from post-traumatic stress disorder and problems with social contact which make it difficult to adjust to living in a shelter with other men. He also believes that there are few housing alternatives available and that the available shelters are always full.

3

Steven Marshall, a homeless advocate employed by the nonprofit Champlain Valley Office of Economic Opportunity, testified that the encampment is one of many camps, some known and others entirely hidden, located on City property. He believes that the City chases the homeless population around by closing camps and causing the residents to move on to other locations. He described the closure of the Sears Lane camp in the vicinity of the Department of Public Works building off Pine Street. After notice (Pls.' Ex. 3), that encampment was closed without opposition by the residents due to the presence of two campers whom he believed to be violent and engaged in drug dealing. He testified that the City has not identified areas in which camping is permitted. He described having a place to live as a fundamental human right. In his view, the number of shelter and other housing solutions for homeless people in Burlington is inadequate to meet the need.

The City's witnesses presented a different account. It is clear from the testimony of BPD Community Affairs Liaison Lacey-Ann Smith and the other witnesses that the City has adopted a policy of toleration of homeless encampments unless a specific camp violates one of the four criteria in City policy. If an encampment does not present health and safety concerns, impede the intended use of the property, lead to crime, or appear in an inappropriate location, removal will not take place. The City does not expressly permit the homeless encampments, but it will not displace the residents without cause either.

Plaintiffs assert that the City's policy has been shifting. They presented video clips from a June 2016 press conference in which City officials made remarks that Plaintiffs interpret as articulating a policy of removing all encampments for trespass. Plaintiffs also introduced a copy of an October 10, 2017 BPD press release entitled "Removal of Persons Trespassing on Public Land on Sears Lane." (Pls.' Ex. 5.) The press release states, among other things:

4

> Establishing domiciles on public land, such as those on Sears Lane, is an act of
> trespass. The city decides when to act on this law, as a matter of policy, by
> balancing compassion for people in dire straits with the safety hazards present at a
> given encampment. The underlying trespass violation is a sufficient reason to
> disband the camp once a concern about safety reaches a certain threshold in the
> judgment of the city.

(*Id.*) That document is consistent with the present policy as described at the hearing. The court
is persuaded that the City's witnesses accurately stated the policy as it exists now.

It was clear from the testimony that City leadership is aware that there are as many as ten
encampments located on City property. Actual removals are rare. The witnesses testified to the
removal of the Sears Lane encampment as a result of concerns about violence and drug use at
that location. There was also some testimony at third-hand about the recent removal of a single
camper from the waterfront. These and the pending removal which is the subject of this case
appear to be the only removals during the last two years of homeless encampments. Both the
Sears Lane and the 311 North Avenue decisions followed the City policy of identifying criteria
justifying removal.

The City also provided evidence of its efforts to find homes for people through many
means and multiple agencies. These efforts included various forms of temporary shelters,
temporary supported housing, motel vouchers and other state assistance, and other programs
directed as specific groups such as the mentally ill or victims of domestic violence. The City
does not provide these services directly. Instead, through CEDO it directs federal money to non-
profit agencies such as the Committee on Temporary Shelter (COTS) and Spectrum
organizations which provide housing and other social services.

When the City conducts a removal, it follows a policy intended to protect the residents'
property. Residents receive written notice of the impending removal. On the date of removal,
police officers remove obviously valuable items such as computers and store these at the police

station.   Items such as tents and furniture are stored for 30 days before disposal.   During the 30-
day period, former residents of the encampment may recover any belongings they wish to keep.

**Analysis**

A party seeking a preliminary injunction must either show that [A] he is likely to
succeed on the merits; that he is likely to suffer irreparable harm in the absence of preliminary
relief; that the balance of equities tips in his favor; and that an injunction is in the public interest;
or [B] he may show irreparable harm and either a likelihood of success on the merits or
sufficiently serious questions going to the merits to make them a fair ground for litigation and a
balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Am.
Civil Liberties Union v. Clapper*, 785 F.3d 787, 825 (2d Cir. 2015) (citations and internal
quotation marks omitted).

## I.    Irreparable Harm

The court begins by considering the question of irreparable harm.  Under the law of the
Second Circuit, the allegation of a deprivation of a constitutional right gives rise to a
presumption of irreparable harm for the purposes of a preliminary injunction.  *Conn. Dep't of
Envtl. Prot. v. Occupational Safety & Health Admin.*, 356 F.3d 226, 231 (2d Cir. 2004); *Brewer
v. W. Irondequoit Cent. Sch. Dist.*, 212 F.3d 738, 744–45 (2d Cir. 2000), *superseded by rule on
unrelated issue as stated in Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 171 & n.7 (2d Cir. 2001).
The plaintiffs here have alleged violations of their Eighth and Fourth Amendment rights and
have thereby adequately demonstrated irreparable harm.  (*See* Doc. 9 at 1 (TRO articulating
irreparable harm).)

6

## II.      Likelihood of Success

The court turns next to the question of likelihood of success on the merits.  In their request for a preliminary injunction, the plaintiffs make two primary constitutional arguments. These are:

- the threat of prosecution for trespass violates the Eighth Amendment because it criminalizes the status of homelessness;

- the seizure and disposal of the plaintiffs' property violates the Fourth Amendment.[2]

### A.      Eighth Amendment

In *Robinson v. California*, 370 U.S. 660 (1962), the Supreme Court struck down a California statute which made drug addiction a crime.  Criminalization of such a status or condition violates the Eighth Amendment.  In *Powell v. Texas*, 392 U.S. 514 (1968), the Warren Court expressed similar concerns about prosecution for drunkenness.  In more recent years, the courts have applied this line of Eighth Amendment analysis to municipal ordinances which sought to criminalize homelessness.  The leading case is *Jones v. City of Los Angeles*, 444 F.3d 1118 (9th Cir. 2006), *vacated pursuant to a settlement agreement*, 505 F.3d 1006 (9th Cir. 2007).

In *Jones*, the Ninth Circuit held that an ordinance criminalizing sitting, lying, or sleeping on public streets and sidewalks at all times and in all places within the City of Los Angeles violated the Eighth Amendment because it criminalized the status of homelessness and "acts that are an integral aspect of that status."  *Id.* at 1132.  Relying upon the *Robinson* decision, the court

---

[2] Although not discussed in their motion, Plaintiffs' complaint includes an additional allegation that the notice to vacate—including the direction that the campers "not return"— violates their constitutional right to travel.  (Doc. 1 ¶¶ 122–125.)  The court concludes that Plaintiffs have demonstrated little likelihood of success on that theory.

wrote that "the state may not criminalize 'being'; that is, the state may not punish a person for who he is, independent of anything he has done." *Id.* at 1133. The court relied upon the *Powell* decision to extend the reasoning to actions which are involuntary. The plurality in *Powell* (four dissenters plus a concurrence) "stand[s] for the proposition that the Eighth Amendment prohibits the state from punishing an involuntary act or condition if it is the unavoidable consequence of one's status or being." *Id.* at 1135. Since homelessness was involuntary, an ordinance which prohibited normal human behavior such as sleeping outside of the home violated the Eighth Amendment.

This case is very different. The evidence at the preliminary injunction hearing showed that the City has not sought to enforce the Vermont trespass statute in a manner which criminalizes the status of homelessness. Notice is an essential element of the crime of trespass on open land. 13 V.S.A. § 3705; *see State v. Dixon*, 169 Vt. 15, 17, 725 A.2d 920 (1999) (noting elements of criminal trespass). Without notice, no crime has occurred. A person who joins an encampment on City property (excluding parks and other areas identified by ordinance where camping is prohibited) has not committed an offense. The evidence was clear that the City does not post trespass notices at the location of every encampment. Like any property owner, however, the City has the right to provide notice that entry is prohibited. The City issues notices to vacate in particular cases and on the basis of specific criteria. The threat of criminal prosecution after notice is real, but the City has not engaged in a broad prohibition of necessary human conduct of the type which raised Eighth Amendment issues in the *Jones* case.

The court recognizes that the plaintiffs' status as homeless individuals is involuntary. Neither of the plaintiffs who testified chose homelessness. Both wish to have homes. But the conduct for which they are threatened with prosecution for trespass is relatively narrow. It is

remaining upon a particular parcel of City property after receiving a notice to vacate. They do not face prosecution for conduct which is an unavoidable consequence of their status as homeless individuals. These plaintiffs have options of moving to other camp sites or engaging in a more robust search for alternative housing through the many avenues supported by the City. They are very different from the homeless plaintiffs in *Jones* who were cited and prosecuted for sitting or sleeping anywhere available to them in the City of Los Angeles. Because the plaintiffs have choices about their conduct, including lawful choices, a citation for trespass arising out of an unlawful choice to remain in violation of the City's direction does not violate the Eighth Amendment.

### B.    Fourth Amendment

The Fourth Amendment does not prohibit all seizures of property by the government. It prohibits "unreasonable" searches and seizures. U.S. Const. amend. IV. In this case, any claim that the seizure is unreasonable is resolved through the mechanism of safeguarding and return of the seized property. The City owns the property at 311 North Avenue. Like any owner, it has the last word on how its property is used. In this case, the City has given notice that it does not wish to permit personal property such as camping equipment to remain on the land. When the notice period expires, the City has no remedy other than seizure. If the City seized and disposed of the property without an opportunity for its owner to regain possession, that course of conduct would almost certainly violate the prohibition against unreasonable seizures. *See Lavan v. City of Los Angeles*, 693 F.3d 1022, 1030 (9th Cir. 2012) (homeless individuals showed a "strong likelihood of success on the merits of their claim that by collecting and destroying [their] property on the spot, the City acted unreasonably in violation of the Fourth Amendment.").

But that is not the case here.  The testimony was undisputed that the City's practice is to store the property for an additional 30 days in order to give it back to its owners.  The impending action of the police and the Department of Public Works in removing the property from the land after notice and followed by an opportunity to recover the property is not an unconstitutional seizure.

For these reasons, the court concludes that the plaintiffs have not demonstrated a likelihood of success on the merits.

III.    **No Serious Questions Going to the Merits**

The remaining issue is whether the plaintiffs have raised sufficiently serious questions going to the merits coupled with a balance of hardships tipping in their favor.  In the court's view, the analysis of likelihood of success applies with equal force to the standard of serious questions going to the merits.  Looked at carefully in the context of an evidentiary hearing, it is clear that Plaintiffs are not being threatened with prosecution for being homeless or for acting in a manner which a homeless person cannot avoid.  They are threatened with the consequences of remaining in a single location when there are options open to them ranging from seeking housing through multiple social agencies to moving to another location on City property.  They are not likely to demonstrate a constitutional violation.

In the absence of a showing of serious questions going to the merits, the court does not reach the issue of balance of hardships.

## Conclusion

The motion for a preliminary injunction is DENIED.  The Temporary Restraining Order that was issued on October 20, 2017 and extended on October 25, 2017 is VACATED.

Dated at Rutland, in the District of Vermont, this 27th day of October, 2017.

Geoffrey W. Crawford, Judge
United States District Court