## UNITED STATES DISTRICT COURT
## DISTRICT OF VERMONT



U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2017 NOV 30  PM 2: 50

CLERK

BY_____
DEPUTY CLERK

| | |
|---|---|
| BRIAN CROTEAU, LARRY PRIEST, | | |
| RICHARD PURSELL on behalf of themselves | | |
| and all other similarly situated, | | |
| *Plaintiffs* | Civil Action No., 5:17 – CV- 207 |
| *vs.* | |
| CITY OF BURLINGTON | |
| *Defendant* | |

### INTERVENORS' COMPLAINT

TO THE HONORABLE JUDGE GEOFFREY CRAWFORD:

COMES NOW Mark Flynn, and Curt Fifield pro se intervening-plaintiffs complaining of the

City of Burlington and the Hon. Phil Scott, Governor of the State of Vermont, in his official capacity as

the chief executive officer of the State, alleging plaintiffs are unconstitutionally restrained in their

liberty, and *inter alia* being denied their privileges and immunities under 42 U.S.C. § 12101 *et seq.,* and

for their requested relief would show unto the Court as follows...

### JUDICIAL NOTICE REQUESTED

1.   Title 13 V.S.A. § 3901 in relevant part:
     *"A transient person, roving from place to place and living without visible means of support who
     begs shall be deemed a vagrant..."*

2.   Title 13 V.S.A. § 3902 in relevant part:
     *"A vagrant shall be imprisoned for not more than six months or fined not more than $100.00..."*

3.   The Code of Ordinances of the City of Burlington, Vermont, Chapter 21 § 9 in relevant part:
     *"No person shall solicit contributions for charitable ... or other purposes upon the streets or by
     going from place to place within the city unless the person ... for which contributions are
     solicited has filed with the police department a letter stating his name and address ... and the
     dates that contributions will be sought..."*

4.   The Code of Ordinances of the City of Burlington, Vermont, Chapter 21 § 8 in relevant part:
     *"(c)   Prohibited acts.*

*(1)   No person shall solicit in an aggressive manner in any public place.*

*(2)   No person shall solicit on private or residential property without permission from the owner or other person lawfully in possession of such property.*

*(3)   No person shall solicit within fifteen (15) feet of public toilets.*

*(4)   No person shall solicit within fifteen (15) feet of any entrance or exit of any financial institution or check cashing business or within fifteen (15) feet of any automated teller machine without the consent of the owner of the property or another person legally in possession of such facilities. Provided, however, that when an automated teller machine is located within an automated teller machine facility, such distance shall be measured from the entrance or exit of the facility.*

*(5)   No person shall solicit while under the influence of alcohol or a controlled substance.*

*(6)   No person shall solicit by stating that funds are needed to meet a specific need, when the solicitor has the funds to meet that need, does not intend to use funds to meet that need or does not have that need.*

*(7)   No person shall solicit in any public transportation vehicle, or within fifteen (15) feet of any handicapped parking space, taxicab stand, bus, train or subway station or stop or in any public parking lot or structure or dedicated walkway to such parking lot or structure.*

*(8)   No person shall solicit within fifteen (15) feet of an entrance to a building.*

*(9)   No person shall solicit within fifteen (15) feet of any valid vendor location as set forth in Chapter 23 of this Code of Ordinances.*

*(10)   No person shall solicit within fifteen (15) feet of any pay telephone or public information booth, board or other structure, provided that when a pay telephone is located within a telephone booth or other facility, such distance shall be measured from the entrance or exit of the telephone booth or facility.*

*(11)   No person shall solicit in an area unless the area is sufficiently illuminated to allow the solicitee to fully observe the solicitor at a distance of fifteen (15) feet.*

5.   The Code of Ordinances of the City of Burlington, Vermont, Chapter 2 § 1 in relevant part:

*"Street. The word 'street' shall include the entire width between property lines of every way used for vehicular and pedestrian travel which has become public by authority of the law, and such ways in public places other than highways as the public is permitted to use for vehicular and pedestrian traffic."*

6.   The Code of Ordinances of the City of Burlington, Vermont, Chapter 21 § 21

*"No person while upon any street within the city, shall endeavor by words, gestures or otherwise, to beg, invite or secure transportation in any motor vehicle not engaged in carrying passengers for hire, unless said person knows the driver of such motor vehicle, or the owner or other person then riding therein; provided, however, that nothing in this section shall prohibit the solicitation of aid in the event of accident or by persons who are sick or seeking assistance for the sick; and provided further, that this exception for sickness shall apply only in case of bona fide sickness in which an emergency exists. Such practice is hereby declared to be a public nuisance."*

7.   The Code of Ordinances of the City of Burlington, Vermont, Chapter 21 § 8 in relevant part:

*"(c)   Prohibited acts. (1) *** (2) *** (3) *** (4) *** (5) *** (6) ****

*(7)   No person shall solicit in any public transportation vehicle, or within fifteen (15) feet of any handicapped parking space, taxicab stand, bus, train or subway station or stop or in any public parking lot or structure or dedicated walkway to such parking lot or structure.*
*(8)  \*\*\* (9) \*\*\**

8.    The Code of Ordinances of the City of Burlington, Vermont, Chapter 21 § 22 in relevant part:
      *"It shall be unlawful for any person to use indecent, profane or insulting language in a street or public place or near a dwelling house or building within the city.*

9.    The Code of Ordinances of the City of Burlington, Vermont, Chapter 1 § 2 in relevant part:
      *"Public place. The words "public place" shall mean any park, cemetery, school yard or open space adjacent thereto, all streets and parking fields and all waterways.*

10.   The Code of Ordinances of the City of Burlington, Vermont, Chapter 21 § 8 in relevant part:
      *"(c)   Prohibited acts. (1)  No person shall solicit in an aggressive manner in any public place. Soliciting shall mean asking for money or objects of value in a public place, with the intention that the money or object be transferred at that time, and at that place. Soliciting shall include using the spoken, written or printed word, bodily gestures, signs or other means with the purpose of obtaining an immediate donation of money or other thing of value or soliciting the sale of goods or services. However, this ordinance is not intended to prescribe any demand for payment for services rendered or goods delivered. Nor is this ordinance or the definition of solicitation intended to include or prescribe fixed advertising attached to an existing premises. Nor is it intended to include  or prescribe signs or written material allowed under city ordinance section 21-5 or any other  applicable city ordinance, regulation, license or permit.*
      *Aggressive manner shall mean any of the following: a. \*\*\* b.  Continuing to solicit from a person or continuing to engage that person after the person has given a negative response to such soliciting; c. \*\*\* d. \*\*\* e. Using \*\*\* obscene \*\*\* gestures toward a person solicited; f. Following the person being solicited, with the intent of asking that person for money or other things of value ... g. Speaking in a volume unreasonably loud under the circumstances;*
      *Public place shall mean a place where a governmental entity has title to or which the public or a substantial group of persons has access, including but not limited to any street, highway, parking lot, plaza, transportation structure, facility or vehicle, school, place of amusement, park, playground or sidewalk or to the doorways and entrances to buildings or dwellings, or grounds enclosing them thereupon.*

11.   The Code of Ordinances of the City of Burlington, Vermont, Chapter 21 § 9 in relevant part:
      *"No person shall solicit contributions for charitable ... or other purposes upon the streets or by going from place to place within the city unless the person ... for which contributions are solicited has  filed ...  provided within the Church Street Marketplace District such filing will be with the Church Street Marketplace District Administrator through whom a permit may be granted pursuant to Chapter 23 of this Code.*

12.   Chapter 23 § 15 Church Street Marketplace District peddlers and solicitors.
      *(a) Certificate required. \*\*\**

*(b) Definitions. (1) \*\*\* (2) \*\*\* (3) \*\*\* (4) Solicitors. Persons or organizations requesting financial contributions or distributing information concerning a political person or organization.  (5) \*\*\* (6) \*\*\* (7) \*\*\* (8) \*\*\* (9) \*\*\* (10) \*\*\* (11) Person. Any individual, married couple, partnership with five (5) or fewer partners or corporation with five (5) or fewer shareholders.*

*(c)    Administration.*

*(1) Certification by commission. The commission administers the certification and siting of all peddlers and solicitors in the district.*

*(2) \*\*\**

*(3) Granting of certificates. Annual certificates may be granted by the commission for the following categories of peddler: \*\*\**

*Seasonal certificates may be granted by the commission for the following category of peddler: \*\*\**

*Weekly certificates may be granted by the commission for the following categories of peddler: \*\*\**

*Twenty-four hour permits may be granted by the commission for the following categories of peddlers and solicitors: \*\*\* Persons or organizations who wish to set up a booth or stand for noncommercial purposes.*

*a. \*\*\* b. \*\*\* c. \*\*\* d. Booths or stands for noncommercial purposes. Persons wishing to set up a booth or stand for noncommercial purposes pursuant to this section shall file an application with     the commission, therein stating or submitting the following:*

*1.    The name and mailing address of the applicant.*

*2.    A description of the activity the applicant proposes to undertake.*

*3.    A declaration that the applicant or specified designee will be present at the proposed activity for the duration of the permit period and will have the certificate available for inspection at all times during the permit period.*

*The applicant need not obtain liability insurance, however, as required pursuant to Section 23-15(c)(5) and (6), provided the applicant agrees in writing to hold and save the city harmless for any and all liability arising out of the activity undertaken by the applicant.*

*(4) \*\*\* (5) \*\*\* (6) Issuance of twenty-four-hour certificates. Upon receipt of a satisfactorily completed application, the requisite fee ... the administrator shall forthwith issue the appropriate twenty-four-hour certificate, as long as space is available, as provided under this section or the  regulations adopted now or hereafter by the commission, and provided further that the applicant is not in violation of any applicable provision of this Code. The administrator shall notify the commission of all actions on twenty-four-hour certificates at the next regular or special meeting of the commission next following such action(s). Any denial of a twenty-four-hour certificate may be appealed by the applicant to the commission, provided such appeal is in writing and filed with the commission within three (3) working days of the denial. The commission shall hear such appeal at its next regular or special meeting and shall render its decision within fifteen (15) days thereafter.*

*(d) \*\*\* (e) Transfer and display of certificate. (1) Except as specified in subparagraph (2) below,  no certificate issued under the provisions of this section shall be used or worn at any time by any person other than the one to whom it was issued or that person's employee, as provided for under subsection (g) below. A certificate holder or his employee shall display the certificate at all times while that person is peddling or soliciting. Failure to do so shall be*

*considered cause for revocation of such certificate. Such revocation shall not entitle the former certificate holder to any rebate on    fees paid. (2) \*\*\**

*(f) Certificate period. (1) \*\*\* (2) \*\*\* (3) \*\*\* (4) Twenty-four-hour certificates. Twenty-four-hour certificates shall be valid for a period of twenty-four (24) hours ending at midnight of the day specified on such certificate by the administrator. (5) \*\*\**

*(g) Employees. A certificate holder may utilize the services of three (3) employees who shall otherwise meet the requirements provided for in Section 23-7(b) of this Code. The fee for each employee shall be five dollars ($5.00) per three-month period.*

*(h) Fees. (1) On or before June thirtieth of each year, the board of aldermen, upon the recommendation of the commission, will set fees for marketplace peddling and soliciting for the ensuing fiscal year commencing July first. The board of aldermen, upon recommendation of the commission may set different fees for each category of marketplace peddler.*

*(2) The commission may factor fees by zone.*

*(3) There shall be no proration of fees, unless otherwise provided for in this section or the rules and regulations now or hereafter promulgated by the commission.*

*(I) Commission-issued carts and commission-provided storage areas. Certificate holders may contract with the commission for use of commission-owned carts or storage space upon arrangements agreed to by the commission. Any fees charged shall be in addition to the certificate fee provided for herein.*

*(j) Peddling in the Wintergarden (the alley way at 60-64 Church Street extending from Church Street eastward to the municipal parking garage) and in the bus shelter at the northeast corner of Church and College Streets. The commission may contract with peddlers to use space in the Wintergarden and/or in the bus shelter upon arrangements and the payment of fees deemed suitable by the commission.*

*(k) Special festivals, exhibits, markets. The commission may contract with persons or organizations to use portions of the Marketplace for festivals, exhibits, markets or the like upon arrangements and the payment of fees deemed suitable by the commission.*

*(l) Certificate suspension or revocation. On advice of the administrator, the commission may suspend or revoke a certificate without providing any rebate of fees to the certificate holder if the certificate holder:*

*(1) \*\*\* (2) Has a display stand or cart which differs from that submitted in the photograph to the commission; (3) Has a display stand or cart whose dimensions substantially differ from those approved by the commission; (4) Fails to keep the area surrounding the stand or cart clear of trash, debris, snow or ice for a distance of four (4) feet; (5) Uses a motor vehicle in the district for    the purpose of selling merchandise; (6) Keeps animals of any kind near the stand or cart; (7) Uses parking meters, utility poles, trees, or property other than the peddler or solicitor's own stand or cart to advertise in any manner; (8) Fails to remove the stand or cart at the end of every business day; (9) Attempts to obtain the economic benefits from more than one location within the jurisdiction of the commission; (10) Fails to operate from the site specified by either the    commission or the administrator, as appropriate; (11) Fails to display the certificate issued at all times while peddling or soliciting; (12) Or in any other manner violates any provision of this    section or violates any of the terms and conditions of the certificate issued. Prior to suspending or revoking a certificate, the commission shall notify the certificate holder of the time, place, and nature of the hearing, shall specify the legal authority and jurisdiction under which the hearing is to be held, shall reference the particular section of the ordinance or*

*regulations involved, shall set forth a short and plain statement of the matters at issue, and shall provide the certificate holder with an opportunity to respond to any charges and present evidence and argument on all issues involved. The provisions of 3 V.S.A. Chapter 25 pertaining to contested cases shall govern any hearings conducted hereunder.*

13.　The Code of Ordinances of the City of Burlington, Vermont, Chapter 21 § 28 in relevant part:
*"No person shall permit his buildings or other place to be used, frequented or resorted to by any vagrants therein or thereabout...*

14.　Title 13 V.S.A. §§ 3901-02 in relevant parts:
*"A transient person, roving from place to place and living without visible means of support, who enters or attempts to enter a dwelling house, barn or other building without the permission of the owners or occupants thereof, shall be deemed a vagrant." "A vagrant shall be imprisoned for not more than six months or fined not more than $100.00.*

15.　Title 13 V.S.A. § 3905 in relevant part:
*"A vagrant having entered premises who persists in remaining against the will of the owner or occupant thereof shall be imprisoned not more than two years not less than six months.*

16.　The Code of Ordinances of the City of Burlington, Vermont: Chapter 21 § 24:
*"No person shall urinate or defecate in any street, park or other public place except in facilities specifically provided for this purpose.*

17.　The Code of Ordinances of the City of Burlington, Vermont, Chapter 1 § 2 in relevant part:
*"Public place. The words "public place" shall mean any park, cemetery, school yard or open space adjacent thereto, all streets and parking fields and all waterways.*

18.　Title 13 V.S.A. § 3905 in relevant part:
*A vagrant kindles a fire on the lands, or in the public highway adjoining the lands, of any person between May 1 and December 1, without the consent of the owner or occupant thereof shall be imprisoned for not more than two years nor less than six months.*

19.　The Code of Ordinances of the City of Burlington, Vermont, Chapter 13 § 3 in relevant part:
*"(a) * * *
(b)　No person shall build an outside fire, open or contained ... or permit the same to remain burning at any time in the city without obtaining a written permit from the chief of the fire department, a deputy chief or one (1) of the fire wardens of the city, except upon the terms and conditions of such permit.*

20.　The Code of Ordinances of the City of Burlington, Vermont, Chapter 22 § 10:
*"No person, except by authority of the park commission, shall light, kindle or use any fire in any of the city parks.*

21.　The Code of Ordinances of the City of Burlington, Vermont, Chapter 22 § 19:

*"No person shall bathe in any waters in or adjacent to any of the city parks, except in such places and subject to such regulations as the park commission may from time to time especially designate by a public notice set up for that purpose within the park.*

22.   The Code of Ordinances of the City of Burlington - Appendix D (4) Beaches and waterfront areas.

*"(A) Prohibited Activities:*

*(1)   Changing clothes except in bathhouse.*

*(2)   \*\*\**

*(3)   Swimming between the hours of 8:30 p.m. and 9:30 a.m. during the summer season or at any time before the beaches are opened for the season or after they are closed for the season.*

*(4) \*\*\**

*(5)   Swimming from or at Perkins Pier.*

23.   The Code of Ordinances of the City of Burlington, Chapter 21-43 in relevant part:

*(a)   Prohibited activities. The following activities are prohibited at the Fletcher Free Library.*

*(1) \*\*\* (2) \*\*\* (3) \*\*\* (4) Bathing or laundering in restrooms...*

24.   Title 13 V.S.A. 3905 in relevant part:

*"A vagrant who is found carrying a firearm or other dangerous weapon shall be imprisoned not more than two years nor less than six months.*

25.   Title 13 V.S.A. § 4003:

*"A person who carries a dangerous or deadly weapon, openly or concealed, \*\*\* or who carries a dangerous or deadly weapon within any state institution or upon the grounds or lands owned or leased for the use of such institution, without the approval of the warden or superintendent of the institution, shall be imprisoned not more than two years or fined not more than $200.00, or both.*

26.   Title 13 V.S.A. § 4005 in relevant part:

*"\* \* \* a person who carries a dangerous or deadly weapon, openly or concealed, while committing a felony shall be imprisoned not more than five years or fined not more than $500.00, or both.*

27.   *Title 13 V.S.A. § 4016 (2) in relevant part:*

*"Dangerous or deadly weapon" means any \* \* \* other weapon, device, instrument, material or substance, whether animate or inanimate, which in the manner it is used or is intended to be used is known to be capable of producing death or serious bodily injury.*

28.   The Code of Ordinances of the City of Burlington, Chapter 21 § 43 in relevant part:

*(a)   Prohibited activities. The following activities are prohibited at the Fletcher Free Library.*

*(1)* \*\*\* *(2)* \*\*\* *(3) Possessing open or opened intoxicants, food or beverages or being under the influence of intoxicating liquor as defined in 23 V.S.A. § 1200(4) or drug as defined in 23 V.S.A. § 1200(2).*

*(4)   Bathing or laundering in restrooms.*

*(5)   Sleeping.*

*(6)   Being barefoot or shirtless.*

*(7)   \*\*\* (8) \*\*\* (9) \*\*\* (10) Any behavior that disturbs or may interfere with other people's use of the library or behavior that is otherwise illegal.*

29.   *Regulations* promulgated by the municipal library:

   *"The Following Activities Are Prohibited at the Fletcher Free Library, Rule 11. Loitering."*

30.   Regulations promulgated by the municipal library:

   *Posted restroom access policy and custom of restricting access to toilets to select patrons who can provide a "library card" or acceptable government issued "identification."*

31.   The Code of Ordinances of the City of Burlington, Chapter 21 § 46 in relevant part:

   *It shall be unlawful for a person who, with the intent to cause public inconvenience, or annoyance or recklessly creating a risk thereof: (a) \*\*\* (b) \*\*\* (c) In a public place uses abusive or obscene language; or (d) Without lawful authority, disturbs any lawful assembly or meeting or persons; or (e)...*

32.   The Code of Ordinances of the City of Burlington, Chapter 21 § 48 in relevant part:

   *(a)   Prohibited activities. Notwithstanding other rules and regulations, the following activities are prohibited at City Hall Park and may be ticketed under this section.*

   *(1)   Disorderly conduct. Any person who, with the intent to cause public inconvenience, or annoyance or recklessly creating a risk thereof: a. \*\*\* b. \*\*\* c. In a public place uses abusive or obscene language; or d. Without lawful authority, disturbs any lawful assembly or meeting or persons; or e....*

   *(2)   \*\*\**

   *(3)   Possession of open or opened intoxicating liquor as defined in 23 V.S.A. § 1200(4), except as permitted pursuant to an outdoor consumption permit for properly organized and supervised activities or events held within the limits of City Hall Park.*

   *(4)   Possession of a regulated drug as defined in 18 V.S.A. § 4201(29) ...*

33.   The Code of Ordinances of the City of Burlington, Chapter 21 § 49 in relevant part:

   *(a)   \*\*\**

   *(b)   \*\*\* (1) \*\*\* (2) \*\*\* (3) Laws intended to preserve and protect public spaces like the Church Street Marketplace District for the benefit of all people are effective only if those present on the space obey the law. The current criminal and civil penalties for violating these types of laws are frequently inadequate to deter the illegal behavior, to prevent its recurrence, or to provide for the removal of offenders from the public space; (4) Compliance with behavior laws within the Church Street Marketplace District will be enhanced by the immediate administrative sanction of removing offenders from the Church Street Marketplace District in addition to issuing tickets*

*to them. For repeat offenders and for more serious offenses, exclusion for extended periods will further provide a necessary additional remedy to protect the public; (5) The failure to comply with these and other laws creates a public nuisance.*

*(c)   Prohibited activities. Notwithstanding other laws, ordinances, rules and regulations, the following activities are prohibited within the Church Street Marketplace District and may result in a no trespass order authorized under this section. (1) \*\*\* (2) \*\*\* (3) Possession of open or opened intoxicating liquor as defined by 23 V.S.A. § 1200(4), except as permitted pursuant to a valid liquor license and/or an outdoor consumption permit for properly organized and supervised activities or events held within the limits of the Church Street Marketplace District; (4) Possession of a regulated drug as defined in 18 V.S.A. § 4201(29) ..."*

## NATURE OF THE ACTION

34.     This suit is similar to other "homeless" litigation that has occurred and is occurring nationally in our Federal District Courts (e.g., Houston, TX., Civil Action No. 17-cv-1473; Denver, CO., Civil Action No. 16-cv-2155-WJM-CBS). Such cases reflect a profound shift in demographics – a deepening socioeconomic divide. Today some 40.6 million Americans live in poverty (U.S. Census Bureau).

35.     The American population has almost quadrupled during the 20th century—from about 76 million in 1900, to 200 million in 1968, to the 300 million mark in October 2006. In the 1940s – when the U.S. population stood at approximately 132.1 million (less than half of today's population) – 44% of the population was rural (thus fairly evenly split). At the last census the U.S. population had grown to approx. 324.9 million but over 80% are living in urban areas (U.S. Census Bureau).

36.     On first-face the total rural population appears largely static (over the past 77 years) but there is something also unprecedented afoot in rural America. Some 1,350 non-metro counties lost population from 2010 through 2016 - a new record. Migration accounted for that decrease - yet the percentage of residents moving away from rural counties was even higher in the 1950s, 1960s and 1980s. What has revealed a changed status quo is a steady decline over the decades in natural population increase in rural America (births minus deaths). Such decreasing birth-rate is no longer large enough to offset the out-migration. In hundreds of rural counties deaths now outpace births (Bureau of Labor Statistics).

37.     Such tidal population shift has brought never before seen new realities. Homelessness in Los Angeles County soared by 23% in a mere year. Remarkable because it represented an increase from

46,874 to 58,000 individuals. In 2016 New York City estimated it's unsheltered at 73,523; Seattle

10,730; District of Columbia 8,350; Boston 6,240; Los Vegas 6,208; Philadelphia 6,112; Denver 5,500

homeless individuals. Yet these numbers (typically from one-day "point in time" surveys) are widely

agreed to be an under-count as to everyone who experiences housing-insecurity in a given year [to

provide some statistical context a one-day census (on any given day during the year) of the jailed

population in Travis County Texas is approximately 2,500 inmates as a daily reported average but such

facility will incarcerate more than 70,000 discrete inmates over a year's time]. Far more apparent is

unsheltered population within some urban areas are equal or greater than the total populations of many

smaller towns and cities (e.g., Burlington) - even when such homeless numbers reflect just a flawed

one-day survey.

38.     The National Law Center on Homelessness & Poverty has tracked 187 cities since 2006 to

determine the relative increase or decrease of criminalization laws over time:

> "Bans on camping city-wide have increased by 69%.
> "Bans on camping in particular places have increased by 48%.
> "Bans on sleeping in public city-wide have increased by 31%.
> "Bans on sitting and lying down in public have increased by 52%.
> "Bans on loitering, loafing, and vagrancy city-wide have increased by 88%.
> "Bans on loitering, loafing, and vagrancy in particular public places have increased by 14%.
> "Bans on panhandling city-wide have increased by 43%.
> "Bans on panhandling in particular public places have increased by 7%.
> "Bans on living in vehicles has increased by 143%.

39.     In 1797, the Vermont Legislature enacted a law that required: *"That every town and place in*

*this state shall relieve, support and maintain their own poor..."* This law was predicated upon 300 years

of European history – most notably the Elizabethan Poor Laws (which topic is more fully set forth in

our earlier Motion for Continuance – which history is incorporated herein by reference). That Vermont

law only provided a broad outline for the care of this state's poor such that practices were not uniform

place to place. Suffice the first poor house in Burlington was established in 1816. It would be relocated

several times – but continue in existence until 1958 (over a century) (the last location is now the site of Smith Elementary School). By 1916 Chittenden County had five poor farms: in Burlington, Charlotte, Colchester, Milton, and Williston. These publicly funded institutions (alms houses, poor houses, houses of correction, poor farms) were common throughout the state e.g., Stowe, Rutland, Benington. The last Vermont poor farm to close was in Sheldon in 1968 – but the last overseer would continue until 1982 in Bakerfield, Vermont. The take-away is that for over half a millennium caring for the poor was a duty of municipalities and it is only in the past fifty years the present social experiment of federalizing poor relief has been attempted.

40.    The 1797 law set lofty goals. The actual results were often less than admirable. Most towns focused upon "support and maintain their own poor." (emphases added). New arrivals were often "warned out" of town or suffered worse. Town selectmen actually selected who could reside – since the expense of caring for the poor impacted local taxes and town budgets. In 1817 the Vermont Assembly tried legislatively to put an end to warning outs – but communities continued to dispute the origins and residency of the drifting poor – and such conflicts caused more lawsuits between towns than any other cause in the 19th century. Wells, "History of Newbury, Vermont" at pg. 285.

41.    Burlington – the largest metropolitan area in Vermont – has never been immune from the social dilemma of poverty and continues to this present day to regulate its poorest unsheltered inhabitants.

"NOW, THEREFORE, BE IT RESOLVED that the City Council directs the Ordinance Committee to draft an ordinance that creates a criminal penalty for repeat offenders of these types of violations of aggressive and disruptive behavior, such as, but not limited to, public urination, public drunkenness, littering, and sexually aggressive catcalling and that the Ordinance Committee shall bring such ordinance back to the full Council as soon as possible but no later than the council's second meeting in November." [2017].

42.    It is now common knowledge the "Black Codes" (a.k.a. Jim Crow Laws) unconstitutionally disenfranchised emancipated southern slaves and their descendants of their civil liberties. Vagrancy laws played a significant role. Part of that history can also be found associated with 42 U.S.C. § 1981 and a truly unfortunate century-long denial by the federal bench to uphold such unambiguous anti-

discrimination law. Across the nation, and here in New England, the equivalent – Jim Crow's northern

cousin – is much alive as to the long-held enmity towards "vagrants," "vagabond," "tramps,"

"mendicants," "loiters," "beggars" "panhandlers" "transients" "addicts" and "homeless." It is an

enduring prejudice spanning millennia with often life or death consequences.

JURISDICTION AND VENUE

43.     This is a civil rights action arising under 42 U.S.C. § 1983 and the First and Fourteenth

Amendments to the United States Constitution and the Supremacy Clause (Article VI, clause 2) of the

United States Constitution. And Title II of the Americans with Disabilities Act - 42 U.S.C. § 12131

(hereinafter ADA) and 29 U.S.C. 794(a) § 504 of the Rehabilitation Act of 1973 (hereinafter Rehab

Act).

44.     This Court has jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and § 1343

(civil rights jurisdiction). The Court also has supplemental jurisdiction under 28 U.S. Code § 1367, as

to inter-related questions arising under the Vermont Constitution.

45.     Venue in this district is proper under 28 U.S.C. § 1391(b)(1), because the City of Burlington

resides in this district and under § 1391(b)(2), because a substantial part of the events giving rise to the

Plaintiffs' claims occurred in this district.

46.     Title 42 U.S.C. § 1983, provides: "Every person, who under color of any statute, ordinance,

regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be

subjected any citizen of the United States or other person within the jurisdiction thereof to the

deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to

the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . ."

47.     Title 42 U.S.C. § 12132 provides "no qualified individual with a disability shall, by reason of

such disability, be excluded from participation in or be denied the benefits of the services, programs, or

activities of a public entity, or be subjected to discrimination by any such entity."

48.     29 U.S.C. 794(a). Section 504 provides that: "No otherwise qualified individual with a disability in the United States * * * shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance * * *."

## PARTIES

49.     Intervening plaintiff Mark Flynn,

50.     Intervening plaintiff Curt Fifield,

51.     Original plaintiffs Brian Croteau, Larry Priest, Richard Pursell,

52.     Defendant City of Burlington is a municipality organized under the laws of the State of Vermont.

## PROPER THIRD-PARTY

53.     The Hon. Governor of Vermont is a proper party defendant as the chief executive officer of the state and is sued in his official capacity for non-monetary relief, i.e., for declaratory and injunctive relief as to the prospective execution of challenged State laws. Intervenors request leave for third-party practice to join such party to this suit as provided by Rule 14, Fed. Rules Civ. Procedure.

## STANDING - Article III

54.     Plaintiffs allege the statute(s), ordinance(s), regulation(s), custom(s) or usage(s) for which judicial notice was sought or herein cited violate their federal rights as herein set forth.

55.     More fully plaintiffs allege the statutory-scheme is unconstitutional as applied to the particular facts that their case presents.

56.     Alternatively, plaintiffs facially challenge such public acts including under the over-breadth doctrine applicable to First Amendment violations.

57.     Further notwithstanding the typical requirement for standing – plaintiffs alternatively assert *jus tertii* (Latin, "third party rights") standing. Under this doctrine a person may enforce or test the constitutional rights of another (which usually can't be done due to lack of standing). See, e.g., New York State Club Ass'n v. City of New York, 487 U.S. 1, 11, (1988), *"[E]ven though it may be validly applied to the plaintiff and others, it nevertheless is so broad that it 'may inhibit the constitutionally protected speech of third parties.' City Council v. Taxpayers for Vincent, 466 U. S. 789, 798 (1984). Properly understood, the latter kind of facial challenge is an exception to ordinary standing requirements, and is justified only by the recognition that free expression may be inhibited almost as easily by the potential or threatened use of power as by the actual exercise of that power. Thornhill v. Alabama, 310 U. S. 88, 310 U. S. 97-98 (1940). Both exceptions, however, are narrow ones: the first kind of facial challenge will not succeed unless the court finds that 'every application of the statute created an impermissible risk of suppression of ideas,' Taxpayers for Vincent, supra, at 466 U. S. 798, n. 15, and the second kind of facial challenge will not succeed unless the statute is 'substantially' over-broad, which requires the court to find 'a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court.466 U.S. at 801.* Further, it is also possible where there is a close connection between the person whose rights are violated and the person wishing to enforce them, and the constitutional right being enforced is a fundamental right. See e.g., Craig v. Boren, 429 U.S. 190 (1976); Singleton v. Wulff et al., 428 U.S. 106 (1976).

58.     Also, please see: Making Sense of Facial and As-Applied Challenges, William & Mary Bill of Rights Journal, Volume 18 | Issue 3 Article 4 (2010) by Alex Kreit. *"This Article argues that these important questions remain unanswered because categorizing constitutional cases into "facial" and "as-applied" challenges, and relying on these categories to shape doctrine and inform case outcomes, is an inherently flawed and fundamentally incoherent undertaking."* And Cornell Law Faculty

Publications Faculty Scholarship, Paper 110, <u>Facial Challenges to State and Federal Statutes</u> (1994) by

Prof, M.C. Dorf.  Also, <u>Fact and Fiction about Facial Challenges,</u> 99 Cal.  L. Rev. 915 by Richard H.

Fallon Jr., (2011). Available at: http://scholarship.Law.berkeley.edu/californialawreview/vol99/iss4/1 -

Such authoritative argument (the common criticism all three authors present) is herein adopted by

intervening plaintiffs in support of their claim of standing.

<u>STANDING - Americans with Disables Act / Rehabilitation Act</u>

59.     Your plaintiffs are disabled within the meaning of ADA or the Rehab Act.

> 42 USC § 12131(2).  "The term "qualified individual with a disability" means an individual
> with a  disability who, with or without reasonable modifications to rules, policies, or practices,
> the removal of architectural, communication, or transportation barriers, or the provision of
> auxiliary aids and services, meets the essential eligibility requirements for the receipt of services
> or the participation in programs or activities provided by a public entity."

60.     Alternatively, Title II and III of the ADA prohibits discrimination based on disability in general

terms. It extends relief to "any person alleging discrimination on the basis of disability." 42 U.S.C. §

12133.  That "person" need not be an individual with a disability. That person may be an entity or

anyone who is injured by a covered entity's discrimination. Obviously, Congress knew how to limit

enforcement to "individuals with disabilities" if it wanted to.  Yet, in defining who could sue under title

II, and III it provided for broad enforcement by any "person." See e.g., <u>Innovative Health Systems v.</u>

<u>City of White Plains</u>, 931 F. Supp. 222 (S.D.N.Y. 1996).

61.     Alternatively, § 504 of the Rehabilitation Act, 29 U.S.C. § 794, broadly prohibits discrimination

on the basis of disability. The Act provides that "[t]he remedies, procedures, and rights set forth in title

VI of the Civil Rights Act of 1964 . . . shall be available to any person aggrieved by any act or failure to

act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of

this title." 29 U.S.C. § 794a (1988). The "person aggrieved" need not be an individual with a disability.

See e.g., <u>Sullivan v. City of Pittsburgh</u>, 811 F.2d 171, 182 n. 12 (3d Cir. 1987), cert. denied, 484 U.S. 849 (1989).

62.     To satisfy the constitutional requirements for "standing" the plaintiff must allege that (1) it personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant ("injury-in-fact"); (2) the injury fairly can be traced to the challenged action ("causation"); (3) the injury is likely to be redressed by a favorable decision ("redressability"). See <u>Valley Forge Christian College v. Ams. United for Separation of Church and State Inc.</u>, 454 U.S. 464, 471-72 (1982). It is a blend of constitutional requirements and prudential considerations.

63.     Injunctive relief is available "to any person who is being subjected to discrimination," and "[n]othing ... shall require a person with a disability to engage in a futile gesture if such person has actual notice that [a covered entity] … does not intend to comply with [ADA].

64.     In as much such complained public laws or regulations often involve several subjects and multiple proscribed acts – your plaintiff only seeks to sever, declare, enjoin, those certain passages herein alleged unconstitutional or in violation of their rights under other federal law.

64.     Plaintiff assert there is an actual controversy which is justiciable by this court in which your plaintiffs have standing to seek injunctive and declaratory relief. Further relevant facts and law share commonality with the original complaint made in this suit making joinder and consolidation of claims appropriate.

<u>FACTS</u>

65.     Mark Flynn, your intervening plaintiff, is an unsheltered resident of Burlington. I am 54 years of age.  I'm a transient person, I rove from place to place, and live without visible means of support. My total year-to-date wage income is approximately half of the federal poverty guideline. That said I've been employed by the same corporation for more than decade i.e., True Blue Inc. More fully I've been employed by two of its subsidiaries – which have recently merged. Such subsidiary corporation,

People Ready (formerly Labor Ready), is a significant employer of the homeless. It provides to its business clients minimum (and near minimum) wage laborers mostly for unskilled and manual tasks for temporary (daily/weekly) assignments.

66.     I'd prefer to work more – but because of age and health I'm unable to keep-up with the rigorous nature of most of the temporary assignments. I have diabetes, high blood pressure, psoriatic arthritis, I'm over-weight due to poor diet, and suffer from Post-Traumatic Stress Disorder (PTSD) and Depression. Other circumstances also contribute: criminal history, bad credit, lack of educational attainment and lack of professional or skilled employment history - have kept me from earning a full-time living wage – as well as being able to access stable housing.

67.     I've sought social services and used shelter services in Burlington – but found them to be a ladder back to the streets. I have personally experienced and observed the revolving door of such welfare scheme and know of many individuals who end-up on the streets repeatedly – notwithstanding "robust" efforts to stay sheltered (as if such duty exists in law). Having no desire to be a trespasser – I sleep and reside in public places. This has included camping at the Sears Lane encampment this year (which the City closed) as well as in proximity to the 311 N. Ave parcel. I am thus affected by the City's policies in how it regulates public space utilized by the unsheltered including the reduction in areas I'm allowed to access to live / survive (i.e., loss to my liberty). Suffice, there is an accepted judicial norm of internment. Upholding the banning of an activity basic to survival – if a shelter alternative supposedly exits. The real estate gets smaller. Yet I assert a right not to be corralled and institutionalized by non-judicial state action – including into "homeless shelters." Besides penal like conditions, and medically researched risk of serious harm to health – it is a judicial philosophy bereft of recognition of my First Amendment rights of freedom of association and implicit liberty within the ambit of protection of the Fourteenth Amendment. Banishment, rustication, internal exile, outlawed from public space – the recognized civil liberties of the impoverished leave much to be desired.

68.     I am a founding member of the Burlington Homeless Council. I am a board member. The council is unique in that its board members have all personally experienced homelessness. It is a general association charitable trust. We organize charitable events for the homeless community including providing free meals (usually picnic cookouts) and free organized activities (e.g., wiffleball games, group bike rides). We provide informal peer support and provide free health sustaining resources to the homeless community (e.g., sleeping bags, tents, potable water, sanitation services, free bikes). We publish a newspaper and heavily rely upon donations – thus solicit (i.e., beg). We largely rely upon use of public space for our activities.

69.     I am also the spokesperson for Stand w/ the Poor which is an Independent Expenditure Only Political Action Committee (IE-PAC). The committee lobbies on behalf of the homeless community and uses solicitation to obtain donations. I, and the committee, also relies upon being solicited by the homeless and poor so as to determine their needs and to direct our lobbying to addressing those needs.

70.     I am also the owner and a co-publisher of Burlington Street News (registered trade-name). This published paper is dedicated to communicating items of news significant to the homeless community. As owner of the trade-name – I license its use to the Burlington Homeless Council as co-publisher. It is our intent to widen distribution based upon an established model used in other places. Specifically, having the homeless (or our preferred term "the housing-insecure") distribute the free newspaper while begging (we also prefer "soliciting") for their own personal needs or wants. The offering of such free token typically improves donations to them. That said, I allege the contents of our free publication are protected speech (and by reasonable extension it is also the protected speech of those who aid in its public dissemination).

71.     Curt Fifield is 49 years of age. He grew-up in Vermont. He is a chronic alcoholic – and this has caused no shortage of problems for him. He uses his drinking to cope with all the problems caused by his drinking. And like many with a Substance Abuse Disorder – it eventually lead him into the criminal

justice system. He was under orders as a probationer to perform "work crew" several days of the week

(in the time-frame this suit was filed). This made it difficult for him to find more regular gainful

employment. His criminal history and unstable employment and destitution were further impediments.

His alcoholism also meant that he couldn't enter the existing shelter run by COTS (they screen for

alcohol use). Such that between the lack of shelter and lack of income – Curt frequently had to ask for

help to support himself. He has lived unsheltered and rough upon the margins of public property for

several years. Like many who are homeless – it was a daily challenge to find places that would allow

him to use toilet facilities in the City of Burlington. At present – it appears he is again incarcerated. The

Vermont Department of Correction website reports his earliest release date as March 2018. He is, of

course, representative of many who experience being unsheltered.

## Preface - Free Speech Claims

72. The First Amendment provides "Congress shall make no law … abridging the freedom of speech."

73. "Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints. See, e.g., United States v. Playboy Entertainment Group, Inc., 529 U. S. 803, 813 (2000) (striking down content-based restriction). Prohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others. See First Nat. Bank of Boston v. Bellotti, 435 U. S. 765, 784 (1978). As instruments to censor, these categories are interrelated: Speech restrictions based on the identity of the speaker are all too often simply a means to control content." Citizens United v. Federal Election Commission, 558 U.S. 310 (2010).

74. "Can society ban all forms of begging? The simple answer is No" Loper v. New York Police Department, 802 F. Supp 1029 (S.D.N.Y. 1992). See also Reynolds v. Middleton, 779 F.3d 222, 225 (4th Cir. 2015) ("There is no question that panhandling and solicitation of charitable contributions are protected speech."); Clatterbuck v. City of Charlottesville, 708 F.3d 549, 552–54 (4th Cir. 2013) (ruling "speech and expressive conduct that comprise begging" deserves First Amendment protection and invalidating statute banning panhandling on two streets in downtown Charlottesville); Speet v. Shuette, 726 F.3d 867, 875 (6th Cir. 2013) (striking down Michigan statute criminalizing begging and noting "begging is a form of solicitation that the First Amendment protects"); Gresham v. Pereson, 225 F.3d 899, 904 (7th Cir. 2000) (allowing for regulation of some panhandling activities in Indianapolis but following Loper's view of little difference between personal solicitation and those for charitable groups); ACLU v. City of Las Vegas, 466 F.3d 784, 792 (9th Cir. 2006) ("It is beyond dispute that solicitation is a form of expression entitled to the same constitutional protections as traditional speech."); The Massachusetts Supreme Court has also borrowed reasoning from Loper to find First Amendment protections for panhandling, Benefit v. City of Cambridge, 679 N.E.2d 184, 188 (Mass. 1997) (invalidating law banning unlicensed begging and finding distinction between personal solicitation and solicitation for a charity "not a significant one for First Amendment purposes" (quoting Loper v. N.Y.C. Police Dep't, 999 F.2d 699, 704 (2d Cir. 1993)); Smith v. City of Fort Lauderdale, 177

F.3d 954, 955–56 (11th Cir. 1999) (allowing for panhandling regulation on public beaches but noting "[l]ike other charitable solicitation, begging is speech entitled to First Amendment protection"). See more recent U.S. Supreme Court holdings in Reed v. Town of Gilbert 135 S. Ct. 2218 (2015) (The court ruled that government regulations curtailing free speech must be as narrow as possible and must fulfill a "compelling government interest."); also, Thayer v. City of Worcester, 135 S. Ct. 2887 (2015); "Panhandling Regulation After Reed v. Town of Gilbert," Vol. 116 Columbia Law Review No. 4. More fully post Gilbert, within two months of the decision, the 7th Circuit held panhandling ban in Springfield, Ill., unconstitutional. Federal courts have also struck down panhandling laws in Grand Junction, Colo.; Tampa, Fla.; Portland, Maine; and Lowell, Mass.

Count One: Right to Free Speech

**42 U.S.C. § 1983 and First Amendment to the U.S. Constitution**

75.     Plaintiffs facially challenge the regulatory scheme under the over-breadth doctrine. Plaintiffs are unconstitutionally censored especially when such scheme is read in *pari materia.*

76.     More fully 13 V.S.A. § 3901 is essentially a blanket ban on protected First Amendment speech. All begging statewide is essentially criminalized as to our socioeconomic group. This law literally silences homeless Burlingtonians and unsheltered Vermonters to shield more fortunate people from speech that makes them uncomfortable. Restricting the speech of Vermont residents who are in the most serious need is a blatant violation of the First Amendment. This is an attempt to censor certain welcomed content (content-based restriction) including political and religious and artistic speech and expression coming from a particular politically disadvantaged group. First Amendment claims are given "special solicitude." Lovell v. Poway Unified School Dist., 90 F.3d 367, 370 (9th Cir. 1996). Restrictions on speech in traditional public forums are subject to "the highest scrutiny." ISKCON v. Lee, 505 U.S. 672, 678 (1992). The burden is "entirely upon the Government", who can only succeed if it proves that the restrictions meet strict scrutiny, "the most demanding test known to constitutional law." Russell v. Lundergan-Grimes, 784 F.3d 1037, 1050 (6th Cir. 2015). (quotation omitted). §3901 is not content neutral or narrowly tailored in terms of time, place, and manner. See e.g., Gilbert supra also Citizens United v. Fed Election Comm'n, 558 U.S. 310 (2010) citing Brandenburg v. Ohio, 395 U.S. 444 (1969).

77.     Plaintiffs assert their begging has First Amendment value for both themselves as panhandlers

and for those who are on the receiving end of the solicitation: First, panhandling informs those

receiving and witnessing solicitations about societal problems such as homelessness, addiction,

disabilities, the criminal justice system, and poverty, either through the words spoken, or literature, or

the mere act of begging itself. See Helen Hershkoff & Adam S. Cohen, Commentary, Begging to

Differ: The First Amendment and the Right to Beg, 104 Harv. L. Rev. 896, 898 (1991) (noting begging

"provides information about poverty and the lives of poor people"); see also Nancy A. Millich,

Compassion Fatigue and the First Amendment: Are the Homeless Constitutional Castaways? 27 U.C.

Davis L. Rev. 255, 275–81 (1994) (arguing begging contributes to public's awareness of homelessness

as problem). This awareness takes on an added importance in a democratic society, as information

about the existence and prevalence of abject poverty may inform a voter's choices come Election Day.

See Hershkoff & Cohen, supra note 117, at 901–02 (discussing democratic value of begging). On a

deeper level, begging may encourage listeners of the speech or conduct to evaluate their own feelings

about living in a society of homelessness or to fulfill spiritual obligations by giving alms to the needy.

See id. at 899–901 (setting forth these arguments as part of what authors call "enlightenment value" of

begging); Mark Oppenheimer, The Beggars of Lakewood, N.Y. Times Mag. (Oct. 16, 2014),

http://www.nytimes.com/2014/10/19/magazine/the-beggars-of-lakewood.html (on file with the

Columbia Law Review) (discussing role of begging and giving alms in ultra–Orthodox Judaism). The

act of begging allows for panhandlers to achieve self-realization by giving us the freedom to express

ourselves e.g., creative artistic begging: "busking" (free musical performances for donations); juggling,

creating poetry, physical comedy, prose, also "spanging" (begging for spare change) including washing

windshields, shining shoes, vending "homeless newspapers" for donations, and other marginal

commercial services associated with seeking donations and to express our values about giving to others

and society in general. But over-arching the act of begging has health and life sustaining implications.

### Count Two – Licensing of Speech

78.    Re: Chapter 21 § 9. Without waiver of the foregoing claim of total prohibition - the act of

begging in the City of Burlington unconstitutionally requires pre-clearance. See e.g., Citizens United v.

Federal Election Commission, 558 U.S. 310 (2010) citing Watchtower Bible & Tract Soc. of N. Y., Inc.

v. Village of Stratton, 536 U. S. 150, 153 (2002) holding restrictions requiring a permit at the outset

unconstitutional. Such law is further improperly tailored to unconstitutionally chill protected speech

five-fold. First: The City's choice of the police department for the submission is calculated to

intimidate (note this license is not issued by the City Clerk per the usual – see Chapter 19 §§ 1-18).

Second: the requirement to provide a home address is another onerous burden for the unsheltered.

Third: Such pre-clearance is for traditional public fora; and Forth: the requirement to specify dates -

thus to be limited to those dates - is yet another undue burden for the impoverished living day-to-day.

Five: the downtown location with the best pedestrian traffic flow (i.e., Church Street Market Place) is

subject to prior approval from such district and has a labyrinth regulatory scheme – but in sum doesn't

allow panhandling (no surprise). More fully a "*prior restraint on speech, i.e., any regulation that gives*

*public officials the power to deny use of a forum in advance of actual expression, Southeastern*

*Promotions, Ltd. v. Conrad, 420 U.S. 546, 552-53,  (1975), such as a requirement that a permit be*

*obtained in advance of the proposed speech or conduct, see, e.g., Forsyth County v. Nationalist*

*Movement, 505 U.S. at 130, is 'not unconstitutional per se,' but it 'bear[s] a heavy presumption against*

*its constitutional validity,* "'" Southeastern Promotions, Ltd. v. Conrad, 420 U.S. at 558, (internal

quotation marks and other punctuation omitted).

### Count Three – Over-breadth
### Aggregate of Speech Regulatory Scheme

79.    Re: Chapter 21 §§ 8 et cetera.  The place, time, and manner of begging, panhandling, soliciting,

speaking, and expressive conduct is so over-regulated as to effectively leave no public fora. When all

the restrictions and setbacks are considered – we are so censored, chilled, and removed from public

space as to defeat our communicative purpose. When viewed in total – the scheme is content-based restrictions of our speech in favor of other preferred commercial and other speech from the non-destitute. It is not as narrow as possible and is not required by a compelling government interest.

80.     For example, chapter 21 § 8 (part 8) (and 2). These restrictions effectively prohibit approaching for the purposes of soliciting every residence, every business, every non-profit, and every public building. "*No person shall solicit within fifteen (15) feet of an entrance to a building.*" (Part 8). But see similar: e.g., Homeless Helping Homeless, Inc. v. City of Tampa, Florida, No. 8:15-cv-1219-T-23AAS, 2016 WL 4162882, (M.D. Fla. Aug. 5, 2016) (striking down ordinance banning panhandling near a bus stop,

sidewalk cafe, or ATM); Thayer v. City of Worcester, 144 F. Supp. 3d 218 (D. Mass. 2015) (striking down 20-foot no-panhandling zone around entrance to or parking area of any bank, ATM, mass transportation facility or stop, and other public areas.  Salzman v. City of Arcata, Superior Court of California of Humbolt County, Case No., DR110422, holding most buffers unconstitutional using 2nd Circuit *Loper precedent* (Sept. 2012) (opinion has good review of then existing U.S. Supreme Court guidance – pre-Gilbert). Pleading further, "*soliciting shall include using the spoken, written or printed word, bodily gestures, signs or other means with the purpose of obtaining an immediate donation of money or other thing of value.*" (Part 2). Obviously, going to the door of a home or business and immediately asking -- by word, letter, gesture, or other means - for a donation or even immediately asking to be allowed to beg from their property is a "*thing of value.*" Solicitations for money or donations are a recognized form of speech protected by the First Amendment. See: Vill. Of Schaumburg v. Citizens for a Better Env't, 444 U.S. 620, 632 (1980); Jefferson v. Rose, 869 F. Supp. 2d 312 (E.D.N.Y. 2012); Loper supra 999 F.2d 699, at 704 (2d Cir. 1993); Speet v. Schuette, 726 F.3d 867, 878 (6th Cir. 2013); see also Champion v. Commonwealth, No. 2015-SC-000570-DG, 2017 WL 636420, at *2 (Ky. Feb. 16, 2017). Yet such implied non-buffer area is contradicted by Chapter 21 § 28:

"*[n]o person shall permit his buildings or other place to be used, frequented or resorted to by ... any vagrants ... therein or thereabout.*" Further Title 13 V.S.A. §§ 3901-02 presumably preempts the city's ordinances: "*a transient person ... who begs...*" "*shall be imprisoned...*"

Count Four: Void for Vagueness
**42 U.S.C. § 1983 and Fourteenth Amendment to the U.S. Constitution**
Preface

81.     "But the fact that society may find speech offensive is not a sufficient reason for suppressing it. Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection. For it is a central tenet of the First Amendment that the government    must remain neutral in the marketplace of ideas." <u>Federal Communications Commission v. Pacifica Foundation</u>, 438 U.S. 726 (1978).

82.     "[a] law that is content based on its face is subject to strict scrutiny regardless of the government's  benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." <u>Gilbert</u> supra.

83.     Plaintiffs challenging a content-based speech restriction are "deemed likely to prevail" — and therefore entitled to a preliminary injunction. <u>Ashcroft v. American Civil Liberties Union</u>, 542 U.S. 656, 666. The burden is on the government to prove there is no less restrictive alternative that   will fulfill a compelling interest. Id

84.     Re: Chapter 21 §§ 22, 8, 46, 48:

85.     "*It shall be unlawful for any person to use indecent, profane or insulting language in a street or public place or near a dwelling house or building within the city...*

86.     "*It shall be unlawful for a person who, with the intent to cause public inconvenience, or annoyance or recklessly creating a risk thereof ... In a public place uses abusive or obscene language; or (d) * * * disturbs any lawful assembly or meeting or persons...*

87.     "*Any person who, with the intent to cause public inconvenience, or annoyance or recklessly creating a risk thereof... In a public place uses abusive or obscene language; or * * * disturbs any lawful      assembly or meeting or persons...*

88.     "*Continuing to solicit from a person or continuing to engage that person after the person has given a negative response to such soliciting...*

89.     *Using *** obscene *** gestures toward a person solicited...*

90.     *Following the person being solicited, with the intent of asking that person for money or other things  of value...*

91.    *Speaking in a volume unreasonably loud under the circumstance...*

92.    The government's authority to regulate speech or expressive conduct on property that has traditionally been open to the public for such activity, such as public streets and parks, is sharply circumscribed. See, e.g., <u>Forsyth County v. Nationalist Movement</u>, 505 U.S. 123, 130, (1992); United <u>States v. Kokinda</u>, 497 U.S. 720, 726, (1990) (plurality opinion); Perry <u>Education Ass'n v. Perry Local</u> <u>Educators' Ass'n</u>, 460 U.S. 37, 45, (1983). "The Supreme Court ... has repeatedly affirmed the principle that constitutional rights may not be denied simply because of hostility to their assertion or exercise." <u>Bible Believers v. Wayne County, Mich.</u>, 805 F.3d 228, 252 (6th Cir. 2015) (en banc); see also, e.g., <u>McCullen v. Coakley</u>, 134 S. Ct. 2518, 2529 (2014) ("[T]he government may not selectively shield the public from some kinds of speech on the ground that they are more offensive than others." (internal quotations and alterations omitted)); <u>R.A.V. v. City of St. Paul Minn.</u>, 505 U.S. 377, 386 (1992) ("The government may not regulate use based on hostility—or favoritism—towards the underlying message expressed.")

93.    Plaintiffs first aver such restrictions are unconstitutionally vague. See e.g., <u>Coates v. Cincinnati</u>, 402 U.S. 611 (1971). Holding: city ordinance prohibiting three or more persons to assemble on a sidewalk and annoy passersby unconstitutionally vague. Similarly, e.g., <u>Papachristou v. Jacksonville</u>, 405 U.S. 156 (1972) holding: laws against vagrancy unconstitutionally vague.

94.    In the alternative, we contend the regulatory-scheme prohibit innocent conduct or protected speech and expression. See e.g., <u>Kolender v. Lawson</u>, 461 U.S. 352 (1983), holding: "vagrancy statutes cannot turn otherwise innocent conduct into a crime."

95.    Plaintiffs contend use of words (except fighting words, slander, or those that would cause imminent endangerment e.g., "shouting fire in a crowded theater") which are merely insulting, abusive, disturbing, annoying are constitutionally protected including profane and indecent (provided indecent

speech is not audible to children and repetitive and frequently used). See e.g., Federal Communications Commission v. Pacifica Foundation, 438 U.S. 726 (1978) (better known as the landmark "seven dirty words" case). In that ruling, the Court found that only "repetitive and frequent" use of the words in a time or place when a minor could hear can be administratively punished (but importantly such post speech regulation survived constitutional scrutiny because radio broadcasting is pervasive and intrudes into the home) (but the form of publication or broadcasting has since been downplayed as so significant in Citizens United supra).

96.     We further contend recklessly creating the risk of public inconvenience or annoyance is vague and over-broad including as to time, place, and manner as to restricting plaintiff's First Amendment free speech rights.

97.     The differentiation between obscene and indecent *material* (as contrasted with mere speech) is a particularly difficult one, and a contentious First Amendment issue that has not fully been settled. Similarly, the level of offense (if any) generated by a profane word or phrase depends on region, context, and audience.

98.     To illustrate: "indecent" synonyms: unseemly, improper, indecorous, unceremonious, indelicate, unbecoming, ungentlemanly, unladylike, unfitting, unbefitting, untoward, unsuitable, inappropriate, in bad taste, tasteless, unacceptable, offensive, crass, dirty, filthy, rude, coarse, naughty, vulgar, gross, crude, lewd, salacious, improper, smutty, off-color; offensive, sordid, scatological, ribald, risqué, racy, informal raunchy, blue, euphemistic, adult, not appropriate. Likewise "obscene" synonyms: indecent, smutty, salacious, dirty, filthy, X-rated, R-rated, explicit, lewd, rude, vulgar, coarse, crude, offensive, immoral, improper, impure, off-color, degenerate, depraved, debauched, pornographic, lubricious, risqué, erotic, carnal, lascivious, licentious, bawdy, scatological, profane, informal, blue, porn, porno, skin, euphemistic, adult, offensive to moral principles; repugnant, shocking, scandalous, vile, foul, atrocious, outrageous, heinous, odious, abhorrent, abominable, disgusting, hideous, offensive,

objectionable, repulsive, revolting, repellent, loathsome, nauseating, sickening, awful, dreadful, terrible, frightful. Similarly, "abusive" synonyms: insulting, rude, vulgar, offensive, disparaging, belittling, derogatory, opprobrious, disrespectful, denigratory, uncomplimentary, censorious, pejorative, vituperative; scurrilous, blasphemous, bitchy, cruel, brutal, savage, inhuman, barbaric, barbarous, brutish, vicious, sadistic; ruthless, merciless, pitiless, remorseless, uncaring, heartless, cold-blooded, cold-hearted, unfeeling, unkind, inhumane. Yet what cannot be uttered in public remains unclear.

99.     The U.S. Supreme Court has thus required "obscenity laws" to be specific. It is not sufficient to categorically and generically prohibit everything obscene. To be exempt from First Amendment protection the obscenity must appeal to the prurient interest in sex; portray such in a patently offensive way, when taken, and taken, does not have serious literary, artistic, political, or scientific value. But also, and importantly, such sexual conduct, i.e., the forbidden obscene topic, must be specifically defined by the applicable state law. The latter is necessary two-fold. Firstly, because the U.S. Supreme Court overturned an earlier national standard for judging obscenity, i.e., Miller v. California (1973) ("*The jury may measure the essentially factual issues of prurient appeal and patent offensiveness by the standard that prevails in the forum community, and need not employ a "national standard.*"" Pp. 413 U. S. at 30-34). The second rationale for requiring specificity, if a state obscenity law is thus defined and limited, First Amendment values are adequately protected by ultimate independent appellate review of constitutional claims when necessary. Federal Communications Commission supra. Absent such specificity, we claim the obscenity ordinance(s) are void for vagueness on their face.

Count Five: Vermont Constitution
**28 U.S. Code § 1367 and Right to Free Speech & Exercise of Religion**

100.   In State v. Henry 302 Or. 510, 732 P2d 9 (1987), the Oregon Supreme Court ruled that the Oregon state law that criminalized obscenity was an unconstitutional restriction of free speech under the free speech provision of the Oregon Constitution, with the ruling making Oregon the first state in the nation to abolish the offense of obscenity. Plaintiffs also reason the Vermont Constitution is no less

the vanguard of free speech. Article 13th provides. *"That the people have a right to freedom of speech, and of writing and publishing their sentiments, concerning the transactions of government..."* Article 3 provides: *That all persons have a natural and unalienable right, to worship Almighty God, according to the dictates of their own consciences and understandings ... nor can any person be justly deprived or abridged of any civil right as a citizen, on account of religious sentiments, or peculiar mode of religious worship; and that no authority can, or ought to be vested in, or assumed by, any power whatever, that shall in any case interfere with, or in any manner control the rights of conscience, in the free exercise of religious worship."* We therefore assert all our free speech claims as herein plead throughout to be protected by these two provisions of the Vermont Constitution.

Count Six: Federal Preemption

**42 U.S.C. § 1983 and Supremacy Clause (Article VI, clause 2) of the United States Constitution and/or Void for Vagueness under Fourteenth Amendment to the U.S. Constitution**

Preface

101.   "As the Supreme Court stated in <u>Altria Group v. Good,</u> 555 U.S. 70 (2008), a federal law that conflicts with a state law will trump, or "preempt", that state law: Consistent with that command, we have long recognized that state laws that conflict with federal law are "without effect." <u>Maryland v. Louisiana,</u> 451 U. S. 725, 746 (1981).

102.   Re: Chapter 21 § 8 (5). The federal government defines a "controlled substance" as any of the substances listed in the five schedules of the Controlled Substances Act of 1970. The schedules are broken down into five categories. Most, four out of five, schedules list commonly prescribed medications. Only Schedule One have "no accepted medical use" although Schedule One includes e.g., marijuana and ecstasy – such that notwithstanding federal law, therapeutic use claims have some acceptance e.g., as demonstrated by "medical marijuana" laws found in an increasing number of states including Vermont. Most states have adopted the subsequent Uniform Controlled Substances Act of 1973. That said, this local law, Chapter 21(8)(5), pretends to prohibit use of our prescribed medications if we solicit. Plaintiff alleges the doctrine of "field preemption" prohibits the City defendant from regulating the use of medically prescribed controlled substances as this regulatory field is occupied by

Page 28 of 43

the U.S. Food and Drug Administration. Thus, such speech and expressive conduct restriction is over-

broad and lacks any rational relationship as to those who therapeutically use prescribed medications

(thus to be under the substance's intended influence) which are controlled substances. That said, it (part

5) censor's persons seeking help (financial or other assistance) because of their substance abuse

disorder e.g., food, shelter, treatment.

Count Seven

**42 U.S.C. § 1983 and Void for Vagueness; Equal Protection; Substantive Due Process under
Fourteenth Amendment to the U.S. Constitution and Over-breadth First Amendment**

103.    Similarly, such law, chapter 21 § 8 (5), pretends to prohibit those "under the influence of

alcohol" from soliciting. The ordinance does not specify intoxication – but rather "influence." Alcohol

is a generic term for ethanol. Ethanol produces its depressive effects on various areas of the brain

causing the following mental and physical impairments in a *progressive* order as alcohol level increases

in a person (the person becomes more and more influenced until intoxicated) (note root word "toxic" in

"intoxication" as alcohol poisoning results in the latter stages). These progressive stages: dis-inhibition;

euphoria; ataxia; impaired judgment; loss of memory; slurred speech; worsening ataxia; vomiting;

confusion and disorientation; increasing lethargy leading to coma; shutdown of the respiratory centers

and death.

104.    Alcoholism is a disease which also creates known longer-term changes to the brain and other

physiological changes to the body. Chronic alcohol use can affect all parts of the body, but it

particularly affects the brain, heart, liver, pancreas, and immune system. This can result in mental

illness, Wernicke–Korsakoff syndrome, an irregular heartbeat, cirrhosis of the liver, and an increase in

the risk of cancer, among other diseases. Drinking during pregnancy can cause damage to the baby

resulting in fetal alcohol spectrum disorders. Those suffering from chronic alcoholism are known to

suffer from withdrawal including experiencing anxiety, life-threatening seizures, delirium tremens,

hallucinations, shakes and possible heart failure – such the result of the influence of alcohol. In the

United States about 17 million (7%) of adults and 0.7 million (2.8%) of those age 12 to 17 years of age

are affected. National Institute on Alcohol Abuse and Alcoholism: https://www.niaaa.nih.gov/

105.    Plaintiffs similarly takes issue with this law for over-breadth and for unconstitutional vagueness

("men of common intelligence must necessarily guess at its meaning").' For example: at what stage of

ethanol consumption and metabolism - including hungover and detoxification towards sobriety - does

"influence" reference? To what physiological degree? Avoidance - many food recipes include alcohol.

Given its sweep, the ordinance gives the city the power to arbitrarily chill and punish conduct

otherwise constitutionally protected. The economy of Burlington would significantly suffer if alcohol

consumption in its many restaurants, bars, social clubs, residences, businesses, parks, and upon the

adjacent lake and river was prohibited. Countless conversations including innumerable solicitations

take place while alcohol is consumed. Yet those non-impoverished speakers don't face being fined or

arrested. Even when these other people are intoxicated / incapacitated – they are not censored, fined, or

arrested. See 18 V.S.A., §§ 4801-09. Moreover, besides destitution being a limiting factor, the City has

severely proscribed the possession and consumption of alcoholic beverages by the unsheltered and

impoverished. See e.g., Chapter 21 §§ 37, 38, 48, 49: essentially limiting alcohol consumption to three

parks; and only during certain hours; from certain containers. Thus, plaintiff additionally assert – as to

their communicative and associational rights – an unconstitutional denial including the equal protection

of law (under-inclusive: 18 V.S.A., §§ 4801-09). Such speech restriction isn't truly about public safety

– it is about censorship; and concealing the unmet need for addiction treatment and the associated

poverty. This is more political white-wash than bona fide safety of the solicited.

Count Eight

**42 U.S.C. § 1983 and Exercise of Religion; Right of the People Peaceably Assemble; Chill of Right to Receive Information under First Amendment United State Constitution; Void for Vagueness; Equal Protection; Substantive Due Process under Fourteenth Amendment.**

106.    More fully, we further assert First and Fourteenth Amendment rights to be solicited by other

persons including "under the influence" and including those who use "controlled substances." The First

Amendment states that "*Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.*" Emphases supplied. The giving of alms to the poor predates Christianity [ancient Greeks distinguished between the ptochos (Greek: πτωχός, "passive poor" or "beggars") and the penes (Greek: πενής, "active poor"). The New Testament contains several references to Jesus' status as the savior of the ptochos, usually translated as "the poor", considered the most wretched portion of society]. It is an accepted religious practice going back millennia as to multiple religions e.g., Judaism; Christianity; Islam (see Muslim, Zakat, 109); Hinduism [Begging (bhiksha) has been a long religious and spiritual tradition of Hinduism. When the Buddha founded Buddhism, he called his monks Bhikshus (bhikkus)]; Buddhism; Jainism; Shintoism. We further contend homeless substance abuse addicts have a right to exist in public spaces including to publicly communicate their needs – especially those life sustaining (obviously the destitute lack resources to otherwise publish or broadcast). Which status in the community is arguably also supported by e.g., O'Connor v. Donaldson, 422 U.S. 563 (1975) (civil commitments) and Robinson v. California 370 U.S. 660 (1962); Easter v. District of Columbia, 361 F.2d 50 (D.C. Cir. 1966) (en banc); Driver v. Hinnant, 356 F.2d 761 (4th Cir. 1966); Justice White concurring opinion Powell v. Texas 393 U.S. 514 (1968); See also West Virginia Supreme Court of Appeals: State Ex Rel. Harper v. Zegeer 296 S.E.2d 873 (1982). Moreover, this censorship of addicts – especially when our state and nation has declared a state of emergency as to a national opioid epidemic – is not without political implications. "*Given its breadth, the ordinance would give the city the power to punish conduct which would otherwise be constitutionally protected. Additionally, the ordinance violated the constitutionally protected right of free assembly, a core guarantee which could not be abridged merely because someone might be "annoyed.*" Coates v. Cincinnati, 402 U.S. 611 (1971).

Re: Chapter 21 §§ 8, 21, and Chapter 2 § 1

107.     Chapter 21 § 8 prohibits soliciting within fifteen feet of a taxicab stand, bus, train, stop or station, or handicap parking space or in any parking lot or structure, or walkway to such lot or structure. Chapter 21 § 21 further provides no person while upon any street within the city, shall endeavor by words, gestures or otherwise, to beg, invite or secure transportation in any motor vehicle. 'Street' includes the entire width between property lines of every way used for public vehicular and pedestrian travel and such ways in public places as the public is permitted to use for vehicular and pedestrian traffic. Public place means any park, cemetery, school yard or open space adjacent thereto, all streets and parking fields and all waterways. The exceptions for § 21: if the person knows the driver or owner or passenger; if the person is sick or seeking assistance for the sick; in which an emergency exists; for aid in the event of accident; or if the vehicles carries passengers for hire. This scheme is designed to leave intact the privileges of the non-impoverished to hail rides from their social peers; and from for-profit providers; and for their welfare in emergencies. It is also designed to deny the impoverished a forum - and the more advantageous fora - to beg for the donated service of transportation from the general public. Those at the bottom rung – are less likely to know vehicle owners, drivers, passengers. Less likely to be able to hire or have transportation of their own or even a driver's licenses. It is declared a "public nuisance" - yet objectively how different is it to hail transportation commercially or by right of social privilege verses for charitable purposes?  Commercial speech is protected; established associational speech is protected; and speech for some exigent necessities is protected (which is a limited charitable purpose) – but largely prohibited is speech and conduct that might alert a good Samaritan to someone otherwise in real desperate need (religious liberty). As a practical matter it prohibited our begging a ride to Rutland to litigate in this case. Likewise, it largely censors curbside "demonstrations" that our publicly funded mass transit and for-profit transports (licensed by the city) often do not meet the needs of everyone in our communities (hence political speech and conduct).

108.    Streets, sidewalks, public rights-of-way, and parks are "quintessential traditional public forums" for speech, ACLU of Nevada v. City of Las Vegas, 333 F.3d 1092, 1099 (9th Cir. 2003). Public streets are considered the "archetype of a traditional public forum." Frisby v. Schultz, 487 U.S. 474, 480 (1988). The government's ability to restrict speech in these places is extremely limited. Clatterbuck v. City of Charlottesville, 708 F.3d 549, 555 (4th Cir. 2013) (quoting Perry Education Association v. Perry Local Educators' Association, 460 U.S. 37, 45 (1983)). "It is no accident that public streets and sidewalks have

developed as venues for the exchange of ideas. Even today, they remain one of the few places where a speaker can be confident that he is not simply preaching to the choir. With respect to other means of communication, an individual confronted with an uncomfortable message can always turn the page, change the channel, or leave the Web site. Not so on public streets and sidewalks. There, a listener often encounters speech he might otherwise tune out. In light of the First Amendment's purpose 'to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail,' FCC v. League of Women Voters of Cal., 468 U. S. 364, 377 (1984) (internal quotation marks omitted), this aspect of traditional public fora is a virtue, not a vice. McCullen v. Coakley, 134 S. Ct. 2518 at 2529 (2014). "[T]he Government may commit a constitutional wrong when by law it identifies certain preferred speakers. By taking the right to speak from some and giving it to others, the Government deprives the disadvantaged person or class of the right to use speech to strive to establish worth, standing, and respect for the speaker's voice. The Government may not by these means deprive the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration. The First Amendment protects speech and speaker, and the ideas that flow from each." Citizen United supra.

109.    The City's ban falls far from meeting any goal of roadway safety (especially since it is clearly permissive for non-impoverished): it applies at all times of the day and night, regardless of how light the traffic, and so removed from not only all roadways but even sidewalks, and parking lots, and even

customary places where the public boards vehicles, and no matter how unintrusive a solicitation might be. Courts have repeatedly struck down similar bans as not narrowly tailored. See, e.g., Comite de Jornale ros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936 (9th Cir. 2011) (en banc); Reynolds v. Middleton, 779 F.3d 222 (4th Cir. 2015) (finding City failed to prove it had tried less restrictive means than ban on roadside solicitation); Wilkinson v. Utah, 860 F. Supp. 2D 1284 (D. Utah 2012) (striking down ban on soliciting donations near roadways); see also Champion v. Kentucky, --- S.W.3d --- , No. 2015-SC-000570-DG, 2017 WL 636420 (Ky. Feb. 16, 2017) ( (unanimous).

110.    We allege the buffer provisions, silencing provisions, are over-broad and do not provide a person of ordinary intelligence fair notice of what conduct is prohibited. The scheme is so all-inclusive as to put nearly unfettered discretion in the hands of a police officer who sees a person experiencing homelessness communicating with someone more fortunate. *"These onerous restrictions thus function as the equivalent of prior restraint by giving* [the State of Vermont and the municipality of Burlington] *power analogous to licensing laws implemented in 16th- and 17th-century England, laws and governmental practices of the sort that the First Amendment was drawn to prohibit*. Citizen United citing Thomas v. Chicago Park Dist., 534 U. S. 316, 320 (2002); Lovell v. City of Griffin, 303 U. S. 444, 451–452 (1938). The multiple prohibitions for silencing do not provide a person of ordinary intelligence realistically fair notice of what conduct triggers the duty to stop soliciting or speaking. It is so all-inclusive that anyone caught or unsuccessfully soliciting for more than a moment is subject to arrest on an officer's whim.

Preface – Discrimination Claims

111.    This year a tragedy unfolded – the epicenter was the City of San Diego but soon spread to a multi-state epidemic. The Governor of California declared a state of emergency. 19 fatalities; 395 hospitalizations; 600 sickened by the largest person-to-person outbreak of Hepatitis-A in the U.S. (since a vaccine was developed two decades ago). 80,000 vaccinations have since followed. Three circus sized tents were deployed to bring 9000 homeless people into more sanitary conditions; streets and sidewalks were pressure-washed with bleach solution; port-potties and portable sanitation stations

deployed; the mayor ordered restrooms to be open to such public. Far more tragic: two years prior a grand jury warned San Diego it needed more public toilets downtown. The city agreed with the finding but did nothing. It even rejected the jury's proposal to adds signs alerting people to places they could relieve themselves. In just a year homelessness within the city spiked-upwards 14%. California also banned plastic grocery bags – which had served as substitute toilets for the impoverished. And the deadly epidemic followed.

112.    This year the City Council of Burlington passed the following resolution:

> NOW, THEREFORE, BE IT RESOLVED that the City Council directs the Ordinance Committee to draft an ordinance that creates a criminal penalty for repeat offenders of these types of violations of aggressive and disruptive behavior, such as, but not limited to, public urination, public drunkenness, littering, and sexually aggressive catcalling and that the Ordinance Committee shall bring such ordinance back to the full Council as soon as possible but no later than the   council's second meeting in November. [2017].

113.    Meanwhile a formal written survey on toilet/lavatory access was conducted in Burlington. It was canvased at locations where the homeless can be found e.g., the Salvation Army; the Chittenden Emergency Food Shelf; the "Red Door" Church; "Small Potatoes" program at 38 S. Winooski Ave; Church Street; and City Hall Park. Not unexpectedly the survey – each individual survey signed by the person surveyed – reported wide-spread and very high incidence of discrimination as to toilet access against the homelessness. It polled income; housing status; disabilities, racial minority, national origin, and other protected status; and asked several questions as to access to toilets in Burlington (due to bulk the complete survey documentation is available as a PDF file). Notably it reported a sever reduction in the number of places i.e., closures and restrictions of restrooms in the past five years – which it is alleged is tied to the opioid epidemic. The unsheltered being the low-hanging fruit to garner suspicion – hence they are denied access to otherwise supposedly public facilities including places of public accommodation.

114.    The sponsor of the forgoing resolution Councilman "Hartnett recounted an experience earlier this summer at a business in the same vicinity. He was eating at Junior's Downtown when a homeless man entered and asked to use the restroom. When employees told him it was for paying customers only, he urinated on the floor, Hartnett recalled..." By Jicklings, Sevendays, Aug. 23, 2017. https://www.sevendaysvt.com/vermont/begging-for-change-burlington-stabbings-prompt-proposed-penalties/Content?oid=7467784.

115.    The substantially higher incidence of disabilities (physical and mental) among the unsheltered is widely and authoritatively documented and established in the United State and internationally. It is an accepted scientific fact not subject to creditable evidentiary challenge.

109.    The City-defendant is the owner of a multi-million-dollar water and waste-water utility. The plumbing infrastructure associated with such service is ubiquitous – going to practically every building (and park) within the municipality. In support of its tourism economy and sheltered inhabitants the defendant provides public restrooms – seasonally. And locks them at night. Yet another example, it unlocks City Hall on Saturdays to provide toilet access in support the seasonal Farmer's Market in the adjacent park (commercial activity). Yet, whereas the city is fully aware of having an unsheltered population - with a significant sub-population of disabled therein – it discriminates against them regarding all of its services, programs, and activities by failure to provide equal access or reasonable accommodation as to access to safe sanitary plumbing.

116.    Title II emphasizes "program access," meaning that a public entity's programs and services, viewed in their entirety, must be equally accessible to disabled persons. See Pierce v. Cnty. of Orange, 526 F.3d 1190, 1215–16, 1222 (9th Cir. 2008). A public entity must make reasonable modifications to avoid discrimination against persons with disabilities, unless it can demonstrate that doing so would fundamentally alter the nature of the service, program, or activity it provides. 28 C.F.R. § 35.130(b)(7).

117.    A "program or activity" is subject to the accessibility requirements of Section 504 of the Rehabilitation Act of 1973 (Section 504), 29 U.S.C. 794, or one of a city's "services, programs, or activities" under Title II of the Americans with Disabilities Act (Title II), 42 U.S.C. 12132.

118.    The statutory phrases "program or activity" and "service, program or activity" are intentionally expansive. Section 504 provides that "the term 'program or activity' means all of the operations of * * * a department, agency, special purpose district, or other instrumentality of a State or of a local government * * * any part of which is extended Federal financial assistance." 29 U.S.C. 794(b)(1)(A) (emphasis added). The same phrase in the ADA, expanded to include "services" as well, is at least as broad. See 42 U.S.C. 12201(a) ("Except as otherwise provided in this chapter, nothing in this chapter shall be construed to apply a lesser standard than the standards applied under [Section 504] or the regulations issued by Federal agencies pursuant to such title.").

119.    "[T]he ADA's broad language brings within its scope anything a public entity does." Lee v. City of Los Angeles, 250 F.3d 668, 691 (9th Cir. 2001) (citation and internal punctuation omitted) (emphasis added). See also 28 C.F.R. Pt. 35, App. A, p. 476 (analysis of Title II regulations) (same).

120.    The range of things "a public entity does," is obviously very broad. Defendant concentrates on two sort of activities – providing utility services directly to paying constituents and physical handicap barrier-free design within a building such as a library or school. But public entities also provide a service to the community by building public facilities such as sidewalks, soccer fields, hiking trails, amphitheaters, parking lots, nature paths, boat slips, public beaches, etc. Building a soccer field or a parking lot is clearly a government "activity." Maintaining a nature path or a public beach is also a government "service" or "program." And being able to use the park, trail, beach, parking lot or public restroom is one of the "benefits of [these] services, programs, or activities." 42 U.S.C. 12132. See, e.g., Parker v. Universidad De Puerto Rico, 225 F.3d 1, 6-7 (1st Cir. 2000) (public entity must make park accessible under Title II); Tyler v. City of Manhattan, 857 F. Supp. 800, 818 (D. Kan. 1994) (recreational facilities). Cf. Crowder v. Kitagawa, 81 F.3d 1480, 1485 (9th Cir. 1996) (giving parks as example of a "public service" covered by Title II).

121.    Yet under color of state and local law vagrants may not enter any building – even places of public accommodation.

122.    The City defendant further prohibit urination and defecation in public – and clearly intends to further criminalize the pre-existing lack of access to toilets.

123.    The ADA aims to "provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(2). Congress enacted the statute on the premise that discrimination against the disabled is "most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect." Alexander v. Choate, 469 U.S. 287, 295 (1985). Therefore, the ADA proscribes not only "obviously exclusionary conduct," but also "more subtle forms of discrimination—such as difficult-to-navigate restrooms and hard-to-open doors—that interfere with disabled individuals' full and equal enjoyment" of public places and accommodations. Chapman v. Pier 1 Imps. (U.S.) Inc., 631 F.3d 939, 945 (9th Cir. 2011) (en banc) (internal quotation marks omitted).

124.    Your plaintiffs, based upon their present information and belief, are reasoned to believe and therefore allege the City-defendant is a recipient of Federal funding and subject to 29 U.S.C. 794(a). Section 504.

Count Nine
**Americans with Disabilities Act – Rehabilitation Act**

125.    Your Plaintiffs are disabled within the meaning of the ADA. They are routinely and frequently refused use of toilets and washroom facilities throughout the city (as similarly occurs to other disabled homeless) – and thus contend such vagrancy statutory-scheme has been applied to them. And will continue to be applied to them in the future. To beg or to insist upon their right of access under applicable Federal law – they fear criminal and civil prosecution (see e.g., Title 13 V.S.A. §§ 3901-02, § 3905 and Chapter 21 § 8 of The Code of Ordinances of the City of Burlington, Vermont).

126.    The city-defendant has demonstrated a policy, practice, usage, custom, including by lack of adequate training of officials and pattern enforcement – so as not provide adequate toilets and wash-sinks to disabled unsheltered residents in all their services, programs, and activities. Or is the moving force as to the wide-spread denial of use to the disabled homeless due to the city's failure to exercise its vested police powers to prevent such wholesale unlawful discrimination.

127.    The regulatory scheme of defendant further prohibits plaintiffs as a practical matter from bathing and maintaining hygiene including access to hot water (multiple restrictions on kindling fires); including for warmth, personal comfort, and to prepare food to a cooking temperature to make it safe for consumption (lack of reasonable accommodation). The State's emergency winter shelter scheme is predicated upon prevention of fatalities due to extreme inclement weather on a per day basis: "Temperatures or wind chill less than 20 degrees Fahrenheit." "Temperatures less than 32 degrees Fahrenheit with snow and/or freezing rain." Yet unsheltered persons – especially the disabled - suffer other adverse health consequences above 32 degrees Fahrenheit. Many who are left in the terrible cold are disabled; and are left in unsanitary conditions.

<u>Count Ten – Arbitrary</u>
## 42 U.S.C. § 1983 and 14th Amendment to the U.S. Constitution etc.

128.    As more fully set forth in their Motion for Continuance and herein throughout - we further allege such state/municipal regulatory-scheme is unconstitutional under United States Constitutions and Vermont Constitution. We contend the regulatory-scheme "shocks the conscience" or is "arbitrary" and denies us "substantive due process" and "procedural due process" and the "equal protection of law" such to be unconstitutional under the 14th Amendment.

<u>Preface – Second Amendment Claims</u>

The Second Amendment of the United States Constitution reads in relevant part: "* * * *the right of the people to keep and bear Arms, shall not be infringed."*

129.    While hardly ever cited as an affirmative landmark civil rights case, <u>Dred Scott v. Sandford</u>, 60 U.S. 393 (1857) for this instant case is appropriate authority. The court ruled Scott did not enjoy the protection of the Bill of Rights because of his racial background. However, in its ruling, it implies all free men do have the right to bear arms, as well as other rights at issue here at issue, by indicating what would happen if Scott was indeed afforded full protection:

130.    *"It would give to persons of the negro race, ... the right to enter every other State whenever they pleased, ... the full liberty of speech in public and in private upon all subjects upon which its own citizens might speak; to hold public meetings upon political affairs, and to keep and carry arms wherever they went."*

131.    *"The Second Amendment guarantees an individual right to possess a firearm unconnected with service in a militia, and to use that arm for traditionally lawful purposes, such as self-defense within the home."* <u>District of Columbia v. Heller</u>, 554 U.S. 570 (2008).

132.    *"In Heller, we held that the Second Amendment protects the right to possess a handgun in the home for the purpose of self-defense. Unless considerations of stare decisis counsel otherwise, a provision of the Bill of Rights that protects a right that is fundamental from an American perspective applies equally to the Federal Government and the States. We therefore hold that the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in Heller."* <u>McDonald v. City of Chicago</u>, 561 U.S. 742 (2010).

133.    *"The Court has held that the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding ... and that this "Second Amendment right is fully applicable to the States... In this case, the Supreme Judicial Court of Massachusetts upheld a Massachusetts law prohibiting the possession of stun guns after examining whether a stun gun is the type of weapon contemplated by Congress in 1789 as being protected by the Second Amendment... The court offered three explanations to support its holding that the Second Amendment does not extend to stun guns. First, the court explained that stun guns are not*

*protected because they were not in common use at the time of the Second Amendment's enactment...
This is inconsistent with Heller's clear statement that the Second Amendment extends . . . to . . .
arms . . . that were not in existence at the time of the founding... The court next asked whether stun guns
are dangerous per se at common law and unusual ... in an attempt to apply one important limitation on
the right to keep and carry arms... see ibid. (referring to the historical tradition of prohibiting the
carrying of 'dangerous and unusual weapons'). In so doing, the court concluded that stun guns are
'unusual' because they are 'a thoroughly modern invention.' * * * By equating 'unusual' with 'in
common use at the time of the Second Amendment's enactment,' the court's second explanation is the
same as the first; it is inconsistent with Heller for the same reason. Finally, the court used 'a
contemporary lens' and found 'nothing in the record to suggest that [stun guns] are readily adaptable
to use in the military.' * * * But Heller rejected the proposition 'that only those weapons useful in
warfare are protected.' * * * For these three reasons, the explanation the Massachusetts court offered
for upholding the law contradicts this Court's precedent..."* Caetano v. Massachusetts, 577 U.S. ___
(2016) (some internal cites and quotations omitted).

### Count Eleven - Right of the People to Keep and Bear Arms
**42 U.S.C. § 1983 and Second Amendment to the U.S. Constitution**

134.    Your plaintiffs do not desire to possess "unusual" weapons. But rather seek to vindicate their

individual Second Amendment rights to possession of all "other dangerous weapons" as proscribed

under color of 13 V.S.A. § 3905 but which are not prohibited to be possessed by non-vagrant citizens of

Vermont. Your plaintiffs, in regards to "other dangerous weapons", desire to keep and bear in their

actual or constructive possession "all instruments that constitute bearable arms" within the guarantee of

the Second Amendment for traditional purposes e.g., hunting; self-defense; marksmanship and other

sport; occupationally and non-vocationally to manufacture, repair, restore; to buy, sell, barter, use and

accept as collateral, inherit and bequeath, and otherwise speculate upon; as well as appreciate for

artistic; historic; sentimental, and other intrinsic value.

135.    More fully, Vermont has, otherwise in its statutory-scheme, broadly defined dangerous

weapons:

> *"'Dangerous or deadly weapon' means any ... device, instrument, material or substance,
> whether animate or inanimate ... known to be capable of producing death or serious bodily
> injury.*

136.    As unsheltered inhabitants, plaintiffs have need and often little choice but openly carry items

often deemed dangerous weapons e.g., axes (to kindles fires), knives (to prepare food) – but as

reasonably apparent as plead herein vagrants often alarm and inspire fear from both public and officials alike.

137.     Plaintiffs further assert such criminal vagrancy statute is void for vagueness e.g., "*[A] penal statute [must] define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and, in a manner that does not encourage arbitrary and discriminatory enforcement.*" Skilling v. United States, 561 U.S. 358 (2010) citing Kolender v. Lawson , 461 U. S. 352, 357 (1983)(internal references omitted). Plaintiffs assert "other dangerous weapon" lacks sufficient definiteness. Similarly, "vagrant" lacks sufficient definiteness.

138.     With regards to the statutory scheme as to "dangerous or deadly weapons" - we complain such statutes are grammatically unclear. "A person who carries a dangerous or deadly weapon, openly or concealed…" (emphases supplied) would alone - by having in his or her mere possession – violate the criminal statute. That said, "dangerous or deadly weapon" in some instances are statutorily defined, see e.g., 13 V.S.A. § 4016 (2), to also include actual use of the weapon or some element of intent: "* * * *which in the manner it is used or is intended to be used is known to be capable of producing death or serious bodily injury.*" But no such element of intent or use is statutorily supplied with § 3905. It thus criminalizes mere possession.

139.     As unsheltered inhabitants, we often must exigently seek shelter upon unoccupied, undeveloped, and unposted parcels of property. In most instances we don't know the owner of the property, but it is most often "public" i.e., government owned. The owner or lessee may be federal, state, or some subdivision thereof.

> *"A person who carries a dangerous or deadly weapon, openly or concealed, \*\*\* or who carries a dangerous or deadly weapon within any state institution or upon the grounds or lands owned or leased for the use of such institution, without the approval of the warden or superintendent of the institution, shall be imprisoned not more than two years or fined not more than $200.00, or both."* 13 V.S.A. § 4003.

140.    Regarding § 4003, we concede prohibiting weapons inside state institutions (or proximity to state buildings and immediate grounds or "curtilage" thereto) (and irrespective of use or intent) is an appropriate exercise of police powers – but obtaining advance permission from whomever superintendent or warden as to all the lands owned or leased by Vermont and its subdivisions is onerous burden for the unsheltered poor. Especially when the State can instead post notice upon open lands it deems a weapon prohibition justified by public safety. In the absence we are again essentially disenfranchised of our individual Second Amendment rights to keep and bear arms due to our status as unsheltered transients existing in public space. Our Second Amendment guarantee is thus - as a practical matter – by having to perform an abstract of title as we travel and having to obtain advanced official permission – de facto conditioned upon a fiscal litmus test in which we must change our defining homeless impoverished status into having adequate resources to perform such duties – thus preconditions that we comply with the social norm of access private property. We allege as applied to us –  the regulatory-scheme "infringes" upon our Second Amendment guarantee.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek relief from this Honorable Court as follows:

1. For an injunctive order permanently enjoining and restraining Defendants from continuing and repeating the unlawful policies, practices, and conduct complained of herein;

2. For a declaratory judgment that Defendants' policies, practices and conduct as alleged herein were in violation of Plaintiffs' rights under the United States Constitution as set forth herein;

3. For a declaratory judgment that Defendants' policies, practices and conduct as alleged herein were in violation of Plaintiffs' rights under the Vermont Constitution as set forth herein;

4. For a declaratory judgment that Defendants' policies, practices and conduct as alleged herein were in violation of Plaintiffs' rights under the ADA as set forth herein;

5. For a declaratory judgment that Defendants' policies, practices and conduct as alleged herein were in violation of Plaintiffs' rights under the Rehab Act as set forth herein;

6. For costs of suit; and

7. For such other and further relief as the Court may deem just and proper.

Respectfully submitted on this 30 day of November 2017 by:


Mark Flynn pro se
c/o:   184 Elmwood Ave # 206
Burlington, VT. 05402
(802) 488-4869
mark-flynn@mail.com




Curt Fifield pro se
c/o:   Northwest State Correctional Facility
3649 Lower Newton St.
Swanton, VT 05488


## CERTIFICATE OF SERVICE

The undersigned certify a true and correct copy of the foregoing complaint was mailed via regular mail to an attorney of record for each party on the 30 day of November 2017.


_____
Mark Flynn


_____
Curt Fifield